988 F.2d 1529
 Util. L. Rep. P 13,922
KOCH HYDROCARBON COMPANY, A DIVISION OF KOCH INDUSTRIES,
INC., Appellant,
v.
MDU RESOURCES GROUP, INC., formerly known as Montana-Dakota
Utilities Co.; Williston Basin Interstate
Pipeline Company, a subsidiary of MDU
Resources Group, Inc., Appellees.
KOCH HYDROCARBON COMPANY, A DIVISION OF KOCH INDUSTRIES,
INC., Appellee,
v.
MDU RESOURCES GROUP, INC., formerly known as Montana-Dakota
Utilities Co.; Williston Basin Interstate
Pipeline Company, a subsidiary of MDU
Resources Group, Inc., Appellants.
 Nos. 91-3583, 91-3691.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 8, 1992.
Decided March 15, 1993.
 
 Kelly D. Sears, Wichita, KS, argued (Michael McMahon, Wichita, KS, Joseph Cichy, R.W. Wheeler, and John Morrison, Bismarck, ND, on the brief), for appellants.
 Louis H. Willenken, New York City, argued (James S. Hill, and Daniel S. Kuntz, Bismarck, ND, on the brief), for appellees.
 Before BOWMAN, LOKEN, Circuit Judges, and HUNTER,* Senior District Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 Koch Hydrocarbon Company (Koch) brought this diversity action for breach of contract against MDU Resources Group, Inc. (MDU), and Williston Basin Interstate Pipeline Company (WBI), a wholly-owned subsidiary of MDU.[1] After a series of summary judgment rulings and a bench trial, the District Court[2] made its findings and conclusions and entered judgment awarding Koch damages of $31,990,300. Koch appeals, contending that it is entitled to damages in excess of $400,000,000. MDU cross-appeals, also challenging the quantum of damages. By MDU's reckoning, Koch is entitled to little, if anything, in the way of damages.
 
 
 2
 The damages issues raised by the parties are complex. They arise against a backdrop of government regulation, and grow out of ambiguous and otherwise unclear provisions in contracts between the parties for the purchase and sale of natural gas at prices that ceased to reflect market conditions once Congress's partial deregulation of the natural gas industry in the 1980s had turned a shortage of natural gas into an abundant supply.[3] We are inclined to agree with the District Court's suggestions that (1) this case is a prime candidate for mediation or settlement, see Transcript at 2, and (2) the parties are chiefly responsible for the confusing morass in which they, and we, now find ourselves, see Memorandum & Order of Oct. 25, 1991, at 15. As will be developed in this opinion, we believe that a considerable portion of Koch's asserted damages reflect overreaching on Koch's part. Nevertheless, MDU bargained for the contracts as written, and it repudiated those contracts, thereby incurring liability for breach of contract. That much is clear, but many other aspects of the case are not.
 
 I.
 
 3
 Koch is a natural gas processor and seller that owns and operates an extensive natural gas gathering system in, among other locations, Montana and North Dakota. The system includes pipeline, compressors, and a processing plant in western North Dakota, the location relevant to this case.[4] During the time periods relevant to this case, Koch generally purchased gas under percentage-of-proceeds contracts: Koch paid the producers a specific percentage, usually seventy-five percent, of the amount it received when and if it sold the gas. Memorandum & Order of Oct. 25, 1991, at 3.
 
 
 4
 MDU, together with its assignee and wholly-owned subsidiary WBI, is an interstate pipeline and natural gas distributor delivering gas to industrial and residential customers in North and South Dakota, Wyoming, and Montana. In the years leading up to this lawsuit, MDU entered into gas purchase contracts with a number of suppliers, including Koch.
 
 
 5
 In the early 1970s, the United States experienced serious natural gas shortages as a result of "area rate" regulations that limited the amounts producers could charge for natural gas. Richard J. Pierce, Jr., Natural Gas Regulation, Deregulation, and Contracts, 68 Va.L.Rev. 63, 67-69 (1982). Producers were unwilling to invest in exploration for and development of new natural gas sources when their revenues on the gas recovered would be limited by maximum area prices. Id. at 69. In an attempt to address the problem of shortages, Congress enacted the Natural Gas Policy Act of 1978 (NGPA), Pub.L. No. 95-621, 92 Stat. 3350 (codified as amended at 15 U.S.C. §§ 3301-3432 (1988 & Supp. III 1991)). The NGPA provided for escalation of controlled prices and the eventual elimination of price controls on certain natural gas sales.
 
 
 6
 In the face of coming deregulation, pipelines, including MDU, contracted with sellers such as Koch on terms incredibly favorable to the sellers in order to ensure a reliable supply of natural gas. These agreements invariably were long-term contracts,[5] with take-or-pay or take-and-pay clauses,[6] and provided that the agreed-to price for the gas--the maximum lawful price for so long as prices were regulated--could be redetermined (read "increased") upon deregulation only at the option of the seller.
 
 
 7
 The enactment of the NGPA resulted in increased exploration for and production of natural gas and a concomitant oversupply or "gas bubble" in the early 1980s as supply surpassed demand and market prices plummeted. Pipelines like MDU, unable to pass on to customers the pipelines' above-market cost of natural gas, repudiated many of their long-term gas purchase contracts with their suppliers. As noted by the Supreme Court, the take-or-pay contract "has created significant dislocations in light of the oversupply of gas that has occurred since. Today many purchasers face disastrous take-or-pay liability without sufficient outlets to recoup their losses." Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Cos., 498 U.S. 211, 229, 111 S.Ct. 615, 627, 112 L.Ed.2d 636 (1991).
 
 
 8
 Counsel for MDU and WBI conceded at oral argument that there really is no question here of liability for breach of contract.[7] The issues on appeal relate to damages and arise as a result of the convoluted series of contracts, modifications, amendments, and settlements between the parties. Appearing to further complicate matters at some points along the way is the complex regulatory scheme of the NGPA, and the regulations promulgated under the Act by the Federal Energy Regulatory Commission (FERC).
 
 
 9
 In the discussion that follows, the issues raised in Koch's appeal and MDU's cross-appeal are grouped by subject matter as appropriate.
 
 II.
 
 10
 The parties apparently agree that North Dakota law governs the substantive questions in this case. In addition to the ordinary rules of contract law, North Dakota has adopted the Uniform Commercial Code (U.C.C.), including its rules concerning contracts for the sale of goods. N.D.Cent.Code §§ 41-01-01 to 41-09-53 (1983 & Supp.1991). As natural gas is within the U.C.C. definition of "goods," see id. § 41-02-05(2) (1983) (U.C.C. § 2-105), the U.C.C. applies to the transactions at issue here. See Dawn Enters. v. Luna, 399 N.W.2d 303, 306 n. 3 (N.D.1987) (holding that ethanol is "goods" within the meaning of section 41-02-05(2)). We will refer to other U.C.C. provisions as appropriate in our discussion of the issues.
 
 III. The McKenzie Contract
 
 11
 The first gas purchase contract between Koch and MDU, known as the McKenzie contract, was entered into on December 20, 1979, for a term of ten years. Gas Purchase Contract of Dec. 20, 1979, between Koch Hydrocarbon Company and Montana-Dakota Utilities Co. The agreement provided for deliveries of residue gas to MDU at Koch's processing plant in McKenzie County, North Dakota.[8] Under the terms of the contract, as amended, MDU was obligated "to purchase, receive and pay for all of the residue gas which is available for sale by [Koch] up to 50,000 Mcf each day."[9] McKenzie Contract p 4.1, as modified by Amendment to Gas Purchase Contract of Feb. 15, 1980; see also id. art. VIII.
 
 A.
 
 12
 The first issue concerning the McKenzie contract is Koch's challenge to the District Court's use of market price, as opposed to the NGPA maximum lawful price at the time of deregulation, as the contract price for purposes of measuring damages. In an order granting partial summary judgment to MDU, the court, finding that the contract was silent as to price after deregulation, used the "reasonable price" gap filler of the U.C.C., N.D.Cent.Code § 41-02-22 (1983) (U.C.C. § 2-305), to arrive at market price as the contract price. Memorandum & Order of Nov. 1, 1989, at 8.
 
 
 13
 The first paragraph of Article VIII of the McKenzie contract sets forth the price to be paid for the residue gas: "the highest price permitted for the category or categories of gas sold hereunder ... as such prices are established for such date in [the NGPA] and such regulations as [FERC] or any successor governmental authority shall implement." McKenzie Contract p 8.1. The contract continues:
 
 
 14
 If the pricing provisions of [the NGPA] should become inapplicable in whole or in part, then the highest price permitted by [FERC], U.S. Congress, or other governmental authority having jurisdiction shall be paid for the category or categories of gas committed and sold hereunder.
 
 
 15
 Id.
 
 
 16
 Upon partial deregulation on December 31, 1984, the pricing provisions of the NGPA became inapplicable to the residue gas. In fact, all regulation of the category of gas at issue ceased: neither FERC, nor Congress, nor any other "governmental authority" controlled the price of the natural gas. Thus this provision does nothing to establish price upon total price deregulation for this category of gas.
 
 
 17
 Further on in Article VIII, however, the contract does deal explicitly with price upon total deregulation of the gas that was the subject of the contract.
 
 
 18
 In the event the regulation of the price at which natural gas is sold in interstate commerce ceases, then [Koch] shall have the right to request a redetermination of the prices at which natural gas is to be sold hereunder.
 
 
 19
 Id. p 8.4. Koch argues that, because it did not request a redetermination, the contract price remains the NGPA price immediately preceding deregulation. We believe, however, that this provision addresses only the situation of a gas price increase upon deregulation. As Koch itself has noted, "The industry ... believed that gas price would 'fly up' on deregulation. Gas sellers desired to receive a higher price if the 'fly up' occurred. Koch and MDU provided for that possibility in Section 8.4 of the [McKenzie] contract." Brief of Appellant at 28. Thus, paragraph 8.4 has no bearing on the price of gas in the event of a price decrease. This conclusion is supported by the fact that Koch would not likely be interested in seeking a redetermination if price went down following deregulation.
 
 
 20
 Even so, we disagree with the District Court, because we believe these provisions--and the lack of any otherwise clarifying terms--leave the contract not silent but ambiguous on the issue of contract price in the event of a price decrease upon deregulation. See Northwest Cent. Pipeline Corp. v. JER Partnership, 943 F.2d 1219, 1227 (10th Cir.1991) ("The contract may not be explicit, but it certainly is not silent."). Accordingly, we remand to the District Court for consideration of parol evidence concerning the intent of the parties as to contract price in the event of a decrease in the price of gas upon deregulation. We note that the record contains a significant amount of such evidence. If the parties so desire, they should be permitted to present additional evidence on this important question of fact.
 
 
 21
 In the event the District Court determines that the intent of the parties cannot be ascertained from the evidence, then the court would be quite correct in using a "reasonable price," the gap-filler provision of the U.C.C., to complete the contract's price term in the circumstances (deregulation followed by decline in market price). Since this is a take-and-pay contract, the measure of damages for breach is contract price less market price, with Koch required to mitigate. Although both prices may be market price, damages may be assessed if the market price upon deregulation (contract price), was higher than the market price upon breach, as the District Court already has found to have been the case.
 
 B.
 
 22
 Should the District Court decide, after further consideration consistent with this opinion, that market price is indeed the post-deregulation contract price for purposes of measuring damages, an issue raised by MDU in this appeal will become significant. To avoid potential further delay in the resolution of this lawsuit, we will address that issue now.
 
 
 23
 MDU contends that the court used as the contract price an erroneous measure of market price (one that was too high) when calculating damages under the McKenzie contract. After hearing from both sides on the question of damages, the court determined the market price upon which to base its damage award.
 
 
 24
 In its final opinion in this case, the court said,
 
 
 25
 If a determination is made requiring the reasonable market price to be used in damage computations, then the parties' intent regarding such price can at least in part be inferred from reference to section 8.4 of the McKenzie contract. Clearly spot market prices do not establish the reasonable market price.
 
 
 26
 Memorandum & Order of Oct. 25, 1991, at 11. Presumably, the court was referring to the following passage in the McKenzie contract:If [Koch] shall make any such request [for price redetermination upon deregulation], representatives of [MDU] and [Koch] shall promptly meet and attempt to determine the fair value of gas deliverable hereunder for the then remaining term of this Agreement commencing in the first instance on the date such request is made and subsequently on each anniversary of the effective date of such deregulation. In making such determinations, consideration shall be based on the three highest prices being paid for similar type gas being purchased in Montana, Wyoming and North Dakota, but such determination shall also include a thorough economic analysis of all factors affecting such value.
 
 
 27
 McKenzie Contract p 8.4 (emphasis added).
 
 
 28
 The District Court's market price determination is a finding of fact to be reviewed under the clearly erroneous standard. We find nothing in MDU's argument that convinces us the District Court, having MDU's evidence before it as well as Koch's, clearly erred in its determination of market price for purposes of calculating Koch's damages resulting from MDU's breach of the McKenzie contract.
 
 C.
 
 29
 A housekeeping matter: Koch's statement of the issue (but nothing else in its brief) suggests that Koch's arguments made here as applicable to the McKenzie contract apply equally to four other sales agreements between Koch and MDU that incorporate by reference the terms of the McKenzie contract. See Brief of Appellant at 25 ("The trial court erred in finding that the McKenzie and the four sale [sic] contracts were silent as to gas price after December 31, 1984....). To avoid any confusion we will state it directly: Our holdings in this opinion concerning the McKenzie contract apply with equal force to the so-called "four sales contracts."
 
 IV. The Phillips Contract
 
 30
 On October 22, 1980, Phillips Petroleum Company and MDU entered into a twenty-year contract for the purchase and sale of residue gas, known as the Phillips contract. Residue Gas Purchase Agreement of Oct. 22, 1980, between Phillips Petroleum Company and Montana-Dakota Utilities Co. According to the opening declarations in the contract, Phillips and MDU recognized Phillips's proposal to build and operate a natural gas extraction plant, anticipated that "certain volumes of residue gas attributable to sources" noted in the contract would be available from the plant, acknowledged MDU's pipeline system nearby, and so proposed to enter into a gas sales and purchase contract. Phillips Contract at 1.
 
 
 31
 Under the terms of the contract, MDU agreed to buy, and Phillips to sell, "all residue gas attributable to gas produced and saved" from all Phillips-owned sources identified in Exhibit B to the contract. Id. p 1.1. MDU was to take or pay for (even if not taken) "all of the residue gas which is tendered and physically available to [MDU] at the delivery point." Id. p 3.1. Further, if at any time Phillips "desire[d] to commit additional sources of gas" to the contract, it had only to notify MDU in writing, and upon receipt of that notice the named sources would become Exhibit B gas sources for MDU's take-or-pay obligation. Id. p 1.2.
 
 
 32
 Soon after the effective date of deregulation, by letter agreement dated April 12, 1985, Phillips and MDU agreed that Phillips would not assert take-or-pay claims (in excess of 7200 Mcf per day) for the calendar year 1985, in a commendable effort to relieve the economic burden of this take-or-pay contract upon MDU. The parties also agreed to some modifications in the originally agreed-to price for 1985 and prior years. The agreement made no mention of what the price would be after 1985, and did not indicate that price would revert to the original contract price after December 31, 1985.
 
 
 33
 Effective January 1, 1986, Koch acquired the Phillips contract by assignment from Phillips. According to Koch's brief, Koch also acquired the Phillips plant at some point (whether this acquisition occurred at the same time the contract was assigned is not clear), shut it down, and began processing the Phillips contract's Exhibit B sources through its own plant, which had a capacity more than double that of the Phillips plant. Brief of Appellant at 50.
 
 
 34
 MDU neither took nor paid for all the gas tendered by Koch under the contract, and reduced the amount it paid for the gas it did take. By letter dated May 6, 1987, after Koch's refusal to settle with MDU for less than the contracted amounts and prices, MDU repudiated its contracts with Koch, including this take-or-pay obligation, retroactive to May 1, 1987.[10]
 
 
 35
 On December 6, 1989, Koch notified MDU that it was adding as Exhibit B sources the gas MDU was obligated to purchase under the McKenzie contract upon expiration of the McKenzie contract on December 20, 1989, having previously added the sources from four other expiring sales contracts it had with MDU.[11] Although the Phillips plant could not have processed all the residue gas from the additional sources because of its limited capacity, the Koch plant could.
 
 A.
 
 36
 Before calculating damages due Koch on the breached Phillips contract, the District Court noted that "it is not commercially reasonable to wheel over all of the production capacity of the McKenzie plant under the Phillips contract upon the expiration of the McKenzie contract." Memorandum & Order of Oct. 25, 1991, at 12. The court determined that damages should be limited by the maximum volume of gas that the Phillips plant could produce at the time it was closed. Among other adjustments it made, the court reduced the damages Koch claimed under the Phillips contract by approximately fifty percent, as the capacity of the Phillips plant was approximately fifty percent the capacity of the Koch plant.
 
 
 37
 Koch maintains in its appeal that its damages should be based on the full capacity of the plant it devoted to processing gas under the Phillips contract. MDU's argument on cross-appeal is that the damages awarded should be limited not only by reference to the capacity of the Phillips plant, but should be further limited to the actual output of that plant, which was less than its capacity. MDU also argues that damages should be restricted by including only the portion of the Phillips plant's output attributable to sources of gas from certain geographical areas.
 
 
 38
 The District Court's determination that the parties intended to contract for a commercially reasonable gas volume, that is, that they did not intend to buy or sell volumes beyond the capacity of the plant referenced in the introductory declarations of the contract, is supported by the evidence and is a finding of fact that is not clearly erroneous. By the same token, MDU has insufficiently demonstrated that the parties intended that gas bought and sold under the contract would be limited to actual output of the Phillips plant at closing, and that sources of gas should be limited to certain geographical areas. The District Court was exposed to volumes of evidence over many months, and neither our review of the record nor the arguments of the parties convinces us that the court's findings on this issue are clearly erroneous. The calculation of damages based on the capacity of the Phillips plant at the time of its closing is affirmed.
 
 B.
 
 39
 The District Court calculated the damages under the Phillips contract using market price as the contract price for the gas not taken or paid for, rather than the highest regulatory price that was specified by the original contract. Koch contends that the District Court indicated in a summary judgment order that the regulatory price was the appropriate measure of contract price, then reversed itself without explanation in the final order. Koch is mistaken. In denying Koch's motion for summary judgment on the pricing issue, the District Court specifically found that it could not
 
 
 40
 determine as a matter of law whether the parties intended for the pricing term to revert back to the pricing provisions contained in the original contract.... Thus, the letter agreement is ambiguous regarding the price of gas after December 31, 1985, and this ambiguity must be resolved by the fact finder at trial.
 
 
 41
 Memorandum & Order of July 6, 1990, at 8-9.
 
 
 42
 In its final order, the court calculated Koch's damages for MDU's breach of the Phillips contract using market price as the post-1985 contract price. The court thus obviously rejected Koch's argument and accepted MDU's, both arguments having been fully set forth in the court's July 6, 1990, Memorandum and Order denying summary judgment.
 
 
 43
 Under the original Phillips contract, "the price for gas sold and delivered ... shall be the highest applicable maximum lawful prices [sic]," including permitted adjustments, for so long as the NGPA regulated prices. Phillips Contract p 7.1. Upon deregulation, and in the absence of any new regulation, the price was to be the NGPA price at the time of deregulation, "escalated in the same manner as such price was then being escalated under the" NGPA and FERC regulations. Id. Under the terms of the contract, only the seller had the right, upon deregulation, to request that the price be redetermined. See id. p 7.3. Presumably, as with the McKenzie contract, this would occur only if the deregulated price was higher than the NGPA escalated price.
 
 
 44
 The facts demonstrate, and the District Court found, that neither Phillips nor Koch made a request for redetermination. Memorandum & Order of July 6, 1990, at 7. According to the court, the parties nevertheless did intend to modify the price term of the contract, at least for one year, by the letter agreement of April 12, 1985--a modification that was intentionally ambiguous as to price after December 31, 1985, because the parties were unable to agree. After trial, the court apparently was unable to resolve the price issue by reference to the terms of the contract or the letter agreement, but found from the extrinsic evidence that the parties intended for the contract price to be determined by reference to market price. We find no error in the court's resolution of this issue and affirm the use of market price to calculate damages.
 
 C.
 
 45
 MDU maintains that the District Court found MDU liable for breaching a contract that Koch and WBI materially altered without MDU's consent. In 1985, after WBI had succeeded, with FERC's approval, to MDU's pipeline business, and MDU had assigned its rights and delegated its performance under MDU's natural gas sales contracts to WBI,[12] Phillips and WBI entered into a letter agreement to add a delivery point to the Phillips contract. According to MDU, this additional delivery point permitted Koch, after Koch had acquired the Phillips contract, to add McKenzie gas to the Phillips contract's Exhibit B sources when the McKenzie contract expired. MDU contends that, because the addition of a delivery point was a material alteration to the Phillips contract to which MDU did not agree, the damages awarded as a result of the addition of the McKenzie gas to the Phillips contract were improper.
 
 
 46
 Under North Dakota law, "[n]o delegation of performance relieves the party delegating of any duty to perform or any liability for breach." N.D.Cent.Code § 41-02-17(1) (1983) (U.C.C. § 2-210). We agree with MDU, however, that MDU cannot be held liable for any part of Koch's damages that flow from a material alteration of the Phillips contract made by WBI and Koch without MDU's consent. "An assignment of a contractual obligation is necessarily circumscribed by the contemplated performance of the original parties." Sugarlines Co. v. American Crystal Sugar Co., 594 F.2d 687, 691 (8th Cir.1979) (applying North Dakota law).
 
 
 47
 We remand this issue to the District Court. The court must determine whether WBI agreed with Koch to a material alteration without MDU's consent. If WBI agreed to a material alteration without MDU's consent, then the present judgment on the contract, to the extent Koch's damages flow from that alteration, may run only against WBI (which is, of course, also a defendant in this lawsuit). See 4 Arthur L. Corbin, Corbin on Contracts § 866, at 458 (1951) ("the obligor [Koch] and the assignee [WBI] cannot without [the assignor MDU's] consent change the performance that he is bound to render or the conditions on which he is bound to render it").
 
 V. The Injection Contract
 
 48
 On October 14, 1982, Koch and MDU entered into an operating agreement known as the injection contract by which Koch agreed to inject inert gas into the residue gas stream from the McKenzie gas plant, and MDU agreed to pay for this service. Inert gas is used in the natural gas industry to stabilize natural gas to a constant Btu[13] level so that the energy value of the natural gas does not fluctuate. This injection contract replaced an earlier agreement for Koch to inject air into the McKenzie gas stream, an agreement abandoned because of the corrosive effect of oxygen on gas facilities. The term of the injection contract was concurrent with that of the McKenzie contract. Thus the injection contract expired December 20, 1989.[14]
 
 
 49
 Under the terms of the agreement, MDU was to install the necessary equipment and make the necessary modifications to Koch's equipment, all at MDU's expense. MDU also was to "furnish all fuel and power requirements for the facilities providing the inert gas injections." Operating Agreement for Injection of Inert Gas of Oct. 14, 1982, at p 5. MDU agreed to pay Koch the "same revenue for compression of inert gas" as it was paying for compression of air. Id. p 3. "The revenue will be paid on the basis of $1.00 for each thousand cubic feet (Mcf), or increments thereof, of inert gas injected." Id. In addition, MDU agreed to pay Koch "a fee equal to [Koch's] actual cost" of operating the inert gas generating facility, plus $2500 per month. Id. p 4.
 
 
 50
 MDU advised Koch to stop injecting inert gas effective June 22, 1987, and Koch maintains that this was a breach of contract.[15] In its motion for summary judgment, Koch demanded damages of one dollar per Mcf of inert gas that it calculates would have been injected but for MDU's breach, less Koch's saved expenses. Koch also sought $2500 for each month between the alleged breach and the date the contract expired.
 
 
 51
 The District Court held that the injection contract was really two separate agreements: a requirements contract for the injection of inert gas to the extent necessary to stabilize the natural gas to the satisfaction of MDU, and a contract to retain Koch to operate the facility for $2500 per month, plus actual costs, for the duration of the McKenzie contract. The court granted summary judgment to MDU on the requirements contract claim--Koch's demand for one dollar per Mcf of gas that it believes would have been injected. Koch appeals that ruling. The court agreed that MDU had breached the second agreement and awarded Koch damages of $2500 per month from the date of breach to the expiration date of the agreement. MDU has not appealed from this aspect of the judgment.
 
 
 52
 Koch maintains that the injection agreement is not a requirements contract because: (1) the parties agreed to a quantity of inert gas within an established range determined by the Btu content set forth in the McKenzie contract, thus quantity could not be determined by MDU's actual requirements; (2) MDU contracted with others for the injection of inert gas; (3) the injection contract was devoid of the terms "required" or "necessary"; and (4) MDU did not act in good faith in terminating the agreement. We reject Koch's arguments and affirm the judgment of the District Court.
 
 
 53
 Neither the air nor the inert gas injection agreement specifies amounts of inert gas to be injected or Btu levels to be achieved by the injection. The air injection letter agreement states only that Koch agreed to inject air into the natural gas "to stabilize gas deliveries" made pursuant to the McKenzie contract, and MDU agreed to pay a fee for "stabilizing the residue gas." Air Injection Letter Agreement of Apr. 15, 1980, at 1. The inert gas agreement is not even that specific. It specifies neither degree of stabilization nor desired Btu levels, but it does refer to the air injection agreement: "MDU will continue to pay [Koch] the same revenue for compression of inert gas that MDU was paying [Koch] under a separate agreement for compression of air." Operating Agreement for Injection of Inert Gas at p 3. The only reference to Btu levels is in paragraph 7, and demonstrates that the heating value requirements were not inflexible:
 
 
 54
 MDU agrees that during times when the availability of inert gas is reduced or eliminated due to operating problems with the inert gas facilities, MDU will cooperate to keep the McKenzie Gas Plant's operation unaffected. Such cooperation shall include, but not be limited to, increasing the Btu limit for the residue gas provided for in the [McKenzie Contract] and/or receiving residue gas stabilized in part or in whole by injection of air as provided for in the same Gas Purchase Contract.
 
 
 55
 Id. p 7.
 
 
 56
 The McKenzie contract provides that "the gas shall not have a Btu content in excess of 1,100 Btu's per cubic foot." McKenzie Contract p 5.2.[16] Under the terms of the contract, Koch has the responsibility for stabilizing the gas: "It is understood and agreed by the parties hereto that [Koch] may be required to inject air into the residue gas such that the surplus residue gas delivered to [MDU] will meet the maximum heating value specification set out above." Id.
 
 
 57
 Although the injection agreement expires with the McKenzie contract and involves gas sold under the McKenzie contract, it has distinct consideration and new promises. It does not specify a fixed quantity of inert gas and it does not refer to the McKenzie contract for the express purpose of filling in the quantity term. The quantity of inert gas to be injected to stabilize the gas at MDU's desired Btu level thus could be determined by MDU's actual requirements, see N.D.Cent.Code § 41-02-23 (1983) (U.C.C. § 2-306), and could be reduced to zero if the need for stabilization evaporated for any reason other than bad faith on the part of MDU.
 
 
 58
 The District Court specifically rejected Koch's contention that MDU received injection services from others. Had that contention been supported by the evidence, the exclusivity generally required of a requirements contract under the U.C.C. would have been destroyed. See 1 James J. White & Robert S. Summers, Uniform Commercial Code § 3-8, at 162 n. 1 (3d ed. 1988). The court distinguished this injection agreement, which dealt only with the treatment of natural gas purchased by MDU under the McKenzie contract, from injection agreements MDU may have had with others for the stabilization of natural gas from other sources. The court's finding on this issue of fact is not clearly erroneous.
 
 
 59
 Koch's argument that a contract cannot be a requirements contract unless it contains certain "buzz words" is incorrect. The U.C.C. does not so provide, and Koch has directed our attention to no North Dakota cases that so hold. We find Koch's argument to be without merit.
 
 
 60
 Koch contends that MDU discontinued the injections in bad faith, and accuses MDU of various subterfuges that, according to Koch, perpetrated some sort of fraud upon consumers or others. (Koch does not argue, however, that MDU's alleged bad faith in breaching the injection agreement resulted from its breach of the underlying gas purchase contract. See supra note 15.) MDU gives its own reasons for discontinuing injection, the upshot of which is that it no longer had any requirements for the injection of inert gas for stabilization. The District Court found that Koch failed to show that MDU acted in bad faith in terminating the agreement, and we cannot say that this finding is clearly erroneous.
 
 
 61
 We note that the necessary installation of equipment and the modifications of the McKenzie plant all were undertaken at MDU's own expense, and thus it is MDU's investment that now sits idle. This suggests that MDU discontinued the injection of inert gas only because it was no longer necessary, and thereby provides support not only for the District Court's finding on the question of bad-faith termination, but also for the court's view of the injection contract as, in part, a requirements contract. Cf. Oliver-Mercer Elec. Coop., Inc. v. Fisher, 146 N.W.2d 346, 357 (N.D.1966) (holding that contract was not a requirements contract where supplier expended its own funds to install equipment in order to be able to provide electrical service to buyer).
 
 
 62
 We affirm the District Court's decision on the injection contract.
 
 VI. Section 110 Costs
 
 63
 Koch contends that it is entitled to recover its production-related costs under section 110 of the NGPA. 15 U.S.C. § 3320 (1988) (repealed effective Jan. 1, 1993). Section 110 costs may be added to the NGPA maximum lawful price of the first sale of natural gas without violating the maximum lawful price provision of the NGPA. Id. § 3320(a). Thus gas prices may be increased by the amount of costs, other than production costs, "[t]o deliver, compress, treat, liquefy, or condition natural gas." 18 C.F.R. § 271.1104(c)(7)(i) (1992). Two prerequisites must be met before section 110 production-related costs may be included in the price of the gas: the cost must be "borne by the seller" and the seller must be "expressly authorized ... to be compensated for bearing that production-related cost." Id. § 271.1104(a)(2), (3) (1992).
 
 
 64
 Express authorization exists when the gas purchaser agrees to compensate the seller for the cost of providing a specified production-related service that the seller, for its part, has agreed to provide. Id. § 271.1104(c)(4) (1992). The purchaser's agreement will be presumed if the contract states "an amount, or a method for determining an amount, that the purchaser agrees to pay the seller for providing the specified service." Id. § 271.1104(c)(4)(ii)(A). In the absence of an express provision, the presence of an area rate clause in the contract shall evidence the purchaser's intent to compensate the seller for the cost of delivering the natural gas, but not for any other production-related costs. Id. § 271.1104(c)(4)(ii)(B); see also Texas Eastern Transmission Corp. v. FERC, 769 F.2d 1053, 1065 (5th Cir.1985), cert. denied, 476 U.S. 1114, 106 S.Ct. 1967, 90 L.Ed.2d 652 (1986). An area rate clause is a "provision[ ] that permit[s] a change in price to the applicable just and reasonable area ceiling rate which has been, or which may be, prescribed by [FERC] for the quality of the gas involved." 18 C.F.R. § 154.93(b-1) (1992); see id. § 271.1104(c)(4)(ii)(B).
 
 
 65
 Koch insists that it is entitled to recover section 110 costs from MDU under the McKenzie contract, the Phillips contract, and what have become known in this case as the operating agreements. In denying Koch's motion for partial summary judgment, the District Court determined that the issues of section 110 costs under the contracts presented questions of fact for resolution at trial. Memorandum & Order of Aug. 23, 1990.
 
 
 66
 In its final order, having heard all the evidence, the court found that Koch was not entitled to collect section 110 costs under the McKenzie contract, and also declined to award MDU credit for amounts it previously had paid under the contract. The court did find that the parties had agreed that MDU would pay section 110 production-related costs under the Phillips contract, and apparently determined that the operating agreements provided for the recovery of section 110 fees. In both cases the court reduced the amount of section 110 damages claimed by Koch by forty percent to credit MDU for Koch's erroneous computation of the damages, including Koch's claim for amounts attributable to services performed by others for which Koch had no reimbursement obligation. We review the court's decision under each contract individually.
 
 A. The McKenzie Contract
 
 67
 Koch claims the District Court erred in finding that the McKenzie contract did not authorize the award of section 110 production-related costs. We disagree.
 
 
 68
 Koch attempted to persuade the District Court, and now urges upon us, that this paragraph from the McKenzie contract "expressly authorized" Koch to recover costs from MDU:
 
 
 69
 From the commencement of deliveries the price to be paid will be the highest price permitted for the category or categories of gas sold hereunder as such category or categories is or are defined in the [NGPA], and as such prices are established for such date in [the NGPA] and such regulations as [FERC] or any successor governmental authority shall implement. The escalations, allowances and tax reimbursements related to such prices shall be the highest permitted in accordance with [the NGPA] and such regulations.
 
 
 70
 McKenzie Contract p 8.1 (emphasis added).
 
 
 71
 Koch argues that the last sentence of this provision, particularly the reference to "allowances," manifests the parties' intent that the payment of section 110 production-related costs was "expressly authorized." The District Court rejected this argument and so do we. Section 110 costs are a statutorily defined add-on to gas price, and we believe that the parties would have included in the contract a much clearer reference to section 110 costs had they intended to "expressly authorize" the payment of such costs. Our conclusion is buttressed by the fact that nowhere in paragraph 8.1 are the services to be provided by Koch and paid for by MDU "specified" as the regulations require. See 18 C.F.R. § 271.1104(c)(4).
 
 
 72
 As noted above, authorization for the payment of delivery costs may be inferred if there is an area rate clause in the gas purchase contract. Koch maintains that this provision of the McKenzie contract is such a clause:
 
 
 73
 If [FERC] or any other federal governmental agency, the U.S. Congress, any state legislative body or state regulatory authority having jurisdiction or any other valid governmental authority having jurisdiction in the premises shall at any time and from time to time hereafter prescribe, set, allow or approve a price for the same category or categories of gas as is then being sold hereunder higher than the price otherwise payable hereunder, or a higher price for certain categories of sellers which include [Koch], then the price hereunder shall be increased effective as of the date such higher rate is prescribed to equal such higher price....
 
 
 74
 McKenzie Contract p 8.3.
 
 
 75
 The District Court agreed with Koch that this was an area rate clause within the meaning of the FERC regulations. Memorandum & Order of Aug. 23, 1990, at 7-10. In the final analysis, however, the court determined that, although the presence of an area rate clause in the McKenzie contract gave rise to a presumption that the parties expressly authorized the payment of delivery costs, MDU successfully rebutted that presumption by presenting evidence that demonstrated the parties never intended that MDU should pay such costs. Memorandum & Order of Oct. 25, 1991, at 18. Although MDU paid a small amount to Koch, presumably to defray Koch's gathering costs, it is far from clear that either MDU or Koch intended the payment to be pursuant to section 110.[17] We need not and do not reach the question of whether the above-quoted language is indeed an area rate clause, since we find the court's final conclusion as to the intent of the parties is not clearly erroneous.
 
 
 76
 As a final matter on the issue of section 110 costs under the McKenzie contract, Koch argues that, because MDU failed to protest the costs under FERC's regulations, see 18 C.F.R. § 271.1104(h)(4) (1992), MDU cannot now be heard to complain. We disagree. Since section 110 costs were not authorized by the contract, and since MDU so understood the contract, MDU would not have recognized that it might have an obligation to protest these costs under FERC's regulations.
 
 
 77
 We affirm the denial of section 110 costs to Koch under the McKenzie contract.
 
 B. The Phillips Contract
 
 78
 The District Court awarded Koch section 110 damages under the Phillips contract, but reduced Koch's claim by forty percent to exclude costs that, according to the court, were not "borne" by Koch. Koch challenges the reduction as "arbitrary." MDU contends it owes Koch nothing because Koch was unable to demonstrate that any of the costs claimed were "borne" by Koch. For costs to be "borne by the seller" within the meaning of the regulations, they must be "incurred by the seller in providing a production-related service, or in having other persons provide a production-related service on behalf of the seller." 18 C.F.R. § 271.1104(c)(1) (1992).
 
 
 79
 Although Koch has termed the forty percent reduction "arbitrary," we deem it a finding of fact that is not clearly erroneous. Given the disorderly and confusing accumulation of evidence in this trial, it is impossible for us, with any credibility, to second-guess the court in its choice of forty percent as the factor by which to reduce Koch's claim for costs. We credit the District Court for its efforts to provide a reasonable approximation of Koch's damages based on the evidence. We similarly reject MDU's contention that the evidence does not adequately support the court's award of damages.
 
 
 80
 We affirm the court's award of section 110 costs under the Phillips contract, and the amount thereof.
 
 C. The Operating Agreements
 
 81
 MDU and Koch entered into five so-called operating agreements on August 4, 1982, and September 2, 1982, in conjunction with the four gas sales contracts entered into on those same dates. Under the terms of the operating agreements, MDU agreed to pay Koch a fee for transporting through Koch's pipeline system the gas purchased under the four sales contracts. The amount of the fee was to be "equal to" FERC's proposed section 110 generic rates until the proposed rates were approved by FERC, and converted to the final section 110 generic rates thereafter.
 
 
 82
 The District Court awarded Koch damages for breach of the above contract term, but treated the amounts as section 110 costs and therefore reduced them by forty percent for the services the court deemed performed by third parties whom Koch had no obligation to reimburse. Koch appeals this reduction, arguing that under the operating agreements the transportation fee is not governed by the "borne by the seller" restriction of section 110.
 
 
 83
 MDU cross-appeals this issue, contending not only that these fees are section 110 costs, but also arguing that, as such, they are subject to section 110 regulations that, if properly applied, would virtually eliminate damages for the nonpayment of these fees. According to MDU's argument, much of Koch's gathering system used under the operating agreements was more than twenty miles from the wells, so that section 110 allowances would not be collectible, as they are payable only on the first twenty miles of "new" pipeline (as compared with pipeline existing in 1978). See 18 C.F.R. § 271.1104(d)(1)(ii) (1992).
 
 
 84
 Koch counters that the obligations to pay fees under the operating agreements are not subject to section 110 regulations because section 110 was merely the benchmark that the parties agreed to use for computation of the amounts owed. If Koch is correct, the fees are owed and are not subject to any of the section 110 restrictions.
 
 
 85
 We have carefully reviewed the operating agreements and now conclude that the District Court erred in viewing the agreed-to fees as section 110 costs and thus subject to the "borne by the seller" condition upon MDU's obligation to pay them. The language of the agreements demands another conclusion.
 
 
 86
 In each of the operating agreements, Koch agreed to operate the gathering system that was the subject of the agreement, with MDU reimbursing Koch "for the costs incurred." E.g., Lone Butte Operating Agreement of Aug. 4, 1982, art. I.[18] From that gathering system, the gas was to go into Koch's gathering system and from there into Koch's McKenzie plant. Costs for the use of Koch's gathering system were to be paid as follows:
 
 
 87
 In consideration for gathering the gas through [Koch's] gathering system, MDU will pay [Koch] a fee on the residue portion of gas delivered at the tailgate of [Koch's] plant equal to the gathering charges presently proposed by [FERC] in connection with its Section 110 rulemaking proceedings. If, as and when such rule is finalized, the fee will be adjusted to that which is finally allowed.
 
 
 88
 E.g., id. art. II (emphasis added).
 
 
 89
 We hold that these agreements were not for the payment of section 110 costs. Based on the language of the operating agreements, we conclude, as contended by Koch, that section 110 was mentioned only to establish a benchmark figure to use in calculating the fees owed.
 
 
 90
 It follows that section 110 does not restrict Koch's right to collect these fees (although the maximum lawful price restrictions of the NGPA may). Therefore, we remand to the District Court for reevaluation of Koch's damages resulting from MDU's failure to pay these fees under the operating agreements. We do not preclude the possibility that the court may find that, although the fee provision is not controlled by the "borne by the seller" language of section 110 and its regulations, the parties nevertheless did not intend that MDU should pay Koch for costs that Koch did not actually incur. In that event, it would be necessary to limit Koch's damages accordingly.
 
 VII. Storage Limitations
 
 91
 MDU presented to the District Court an affirmative defense that, it contended, freed it from at least a portion of its contractual obligation to purchase gas from Koch. Both the McKenzie contract and the Phillips contract relieved MDU of its obligations to take or pay (Phillips) or take and pay (McKenzie) for gas under the contracts in the absence of the necessary FERC authorization "covering the construction, ownership and operation of the facilities [MDU] deems necessary for it to receive deliveries of gas" under the agreements. McKenzie Contract ex. A, p 9.1; Phillips Contract ex. A, p 9.1. MDU claims that its available storage was a "facility necessary to receive deliveries," and therefore FERC's limits on the amount of purchased gas that it could store triggered Exhibit A, paragraph 9.1 in each of these contracts and served as an affirmative defense to its breach of these contracts.
 
 
 92
 The District Court initially agreed with MDU on this issue, granting partial summary judgment. After trial, however, recognizing that "much of the court's previous certainty ... has been diluted," the court reversed itself. Memorandum & Order of Oct. 25, 1991, at 8. The court's reasoning was two-fold. First, the court credited testimony that the facilities clause found in the two contracts "was intended to refer only to the pipe hookup from the plant to the interstate pipeline." Id. Because knowledgeable people in the industry expected a shortage of natural gas rather than a surplus, a cap on storage was never considered an issue. Second, the court found that MDU failed to demonstrate that FERC's limitations on MDU's gas storage resulted in its inability to fulfill its contractual obligations.[19] MDU has not shown us in this appeal that these findings of fact are clearly erroneous, and thus we affirm the District Court.
 
 VIII. Incidental Damages
 
 93
 Koch argues that, under North Dakota law, it is entitled to incidental damages incurred in reselling the natural gas that MDU did not take.[20] See N.D.Cent.Code § 41-02-89 (1983) (U.C.C. § 2-710) (allowing recovery for "any commercially reasonable charges, expenses, or commissions incurred in stopping delivery, in the transportation, care, and custody of goods after the buyer's breach, in connection with return or resale of the goods, or otherwise resulting from the breach"). According to Koch, its incidental damages resulting from MDU's breach of the natural gas contracts with Koch amount to $13,144,339.94. Notwithstanding that assertion, Koch does not refer this Court to any place in the record where evidence of such damages, or the amount thereof, was adduced. MDU contends that others incurred those costs and Koch was not responsible for their payment, also without reference to the record.
 
 
 94
 The District Court did not indicate that Koch either requested incidental damages or offered proof of those damages, and did not address the issue in any of its opinions. We therefore remand this issue to the District Court, which should decide the merits of Koch's claim for incidental damages if Koch in fact requested them and offered evidence to support its claim.
 
 IX. Production Taxes
 
 95
 The District Court held that Koch failed to prove damages for production tax claims. Under the terms of the contracts, MDU agreed to reimburse Koch for the sums Koch was billed by the taxing authorities, and MDU paid all taxes for which it was invoiced. Because Koch sold some of the gas for less than the contract price, its tax liability likewise was reduced. It is Koch's position, however, that the damages awarded in this case may be subject to additional production taxes (even though the court is awarding damages, not ordering specific performance), and the amount of such taxes thus should be included in the award of damages. We disagree. The damages Koch seeks are both uncertain to occur and wholly speculative in amount. The District Court therefore properly denied them. See N.D.Cent.Code § 32-03-03 (1976) ("Damages may be awarded in a judicial proceeding for detriment ... certain to result in the future.").
 
 X. Damages for Losses Not Sustained
 
 96
 MDU argues that the District Court awarded damages to Koch for losses that Koch did not sustain. According to MDU, Koch saved expenses and avoided costs as a result of MDU's breach, which should have reduced the damages awarded Koch. MDU further speculates that Koch profited from MDU's breaches of contracts with suppliers other than Koch, as well as from other transactions unrelated to the MDU-Koch gas contracts, and argues that the amounts by which Koch profited should be subtracted from the damages award. We reject these arguments.
 
 
 97
 MDU failed to demonstrate factually, either to the court below or to this Court, a basis for reducing Koch's damages for any of the above reasons, much less how the court would go about calculating the offsets. We hold that the District Court did not err in rejecting MDU's proposed reductions to the damage award.
 
 XI. The S-2 Settlement Agreement
 
 98
 On June 1, 1984, MDU and Koch entered into an agreement that altered the terms of some of the gas purchase and sales contracts between the two parties. Service Agreement Under Rate Schedule S-2 of June 1, 1984, between Montana-Dakota Utilities Co. and Koch Hydrocarbon Company [hereinafter S-2 Agreement]. The District Court held that the S-2 agreement did not relieve MDU of its take-or-pay obligations under the relevant contracts, but only released MDU "from the obligation to take title to such gas, thereby allowing the sale to third parties resulting in mitigation of damages" suffered by Koch. Memorandum & Order of Oct. 25, 1991, at 11. MDU contends that the document in fact released MDU entirely from the obligation to take or pay for the gas that was sold to third parties pursuant to the agreement. We cannot agree.
 
 
 99
 It is clear from the introductory paragraphs of the document that the parties' purpose in executing the agreement was two-fold: (1) to ease the burden on MDU under the take-or-pay clauses that resulted from MDU's inability "to purchase all of the gas available for purchase under such contract(s) due to market or other constraints," and to reduce thereby the extent of the damages for which MDU would be responsible; and (2) to keep the residue gas moving so that Koch could "maintain the production of ... crude oil or other hydrocarbons, while avoiding the flaring of the accompanying natural gas." S-2 Agreement at 1.
 
 
 100
 Under the terms of the S-2 agreement, MDU agreed "to provide storage service and incidental transportation, pursuant to its Rate Schedule S-2," for the gas MDU was to purchase under the contracts, when MDU notified Koch it was unable to purchase but willing to store the gas. Id. art I. Koch would retain title to the gas until MDU purchased it. If Koch found another market for a volume of the stored gas, MDU had ten days to exercise its contractual right to purchase that volume.
 
 
 101
 We think the S-2 agreement is clear and unambiguous. Having studied the terms, we can discern neither an intent to release MDU from its contractual obligations permanently, nor an intent to relieve it of future liability under the contracts. This agreement merely postpones transfer of title (and therefore sale and payment obligations). In point of fact, it is Koch that is released from its obligation to sell all its supplies of natural gas to MDU, after a ten-day right of first refusal period to MDU.
 
 
 102
 MDU's efforts to incorporate into this S-2 agreement the intent of suppliers other than Koch that entered into S-2 agreements with MDU is unavailing. Likewise, MDU's quotations of FERC comments made regarding special marketing programs that are totally unrelated to the S-2 agreement are unpersuasive. In fact, in approving the S-2 agreement, FERC said that MDU's S-2 proposal "should not be treated as" a special marketing plan like others FERC had approved on an experimental basis. Order Approving Contested Settlement, 27 F.E.R.C. p 61,312, at 61,578 (1984); see also id. at 61,576. FERC believed
 
 
 103
 that MDU's situation regarding its dependence upon casinghead and residue gas [as compared with well gas] is sufficiently compelling that its novel storage and transportation program should be approved.... We think that MDU has demonstrated sufficient benefit to its customers, in the form of potential take-or-pay relief, and to the public interest in the form of reduced probability of flaring, that its proposed settlement should be accepted.
 
 
 104
 Id. at 61,578.
 
 
 105
 FERC also noted that "[t]he primary purposes advanced by MDU are relief of the company's current oversupply problems by allowing it to continue to receive and store gas that it is unable to resell and the prevention of the wasteful flaring of casinghead and residue gas." Id. at 61,577. Nowhere in its comments did FERC say anything about the S-2 proposal being a special marketing plan that released gas from the take-or-pay contracts between Koch and MDU, or suggest that the agreement did anything other than move some gas along and allow its sale to third parties. MDU's liability, while reduced by the S-2 agreement with Koch, was not eliminated when gas was sold off the system.
 
 
 106
 We see no error in the District Court's holding and affirm its refusal to relieve MDU of all take-or-pay liability for gas released under the S-2 agreement with Koch.
 
 
 107
 XII. Percentage-of-Proceeds Reduction in Damages
 
 
 108
 The District Court found that, for the most part, Koch's contracts with other natural gas suppliers who provided some of the gas that Koch in turn sold to MDU were percentage-of-proceeds contracts. Under such contracts, Koch would process the gas and sell what amounts it could for the best available price, then pay the producer a percentage of the proceeds from those sales. Concluding that the split averaged seventy-five percent to the other producer and twenty-five percent to Koch, the court reduced the price damages Koch claimed by seventy-five percent.
 
 
 109
 In this appeal, Koch argues that the damage award should not have been reduced, since Koch may yet be obligated to reimburse the producers for their seventy-five percent share. We reject this argument. The court did not enforce the contract by ordering specific performance but merely awarded Koch its actual damages. MDU was not ordered to take the gas and pay for it, in which case Koch would be liable to the producers for a percentage of the proceeds. The other producers did not intervene in Koch's suit, and Koch should be allowed to collect only the damages it sustained. If the gas was not sold, Koch did not owe the producers their cut; if Koch did sell to other customers the gas that MDU had contracted to buy, Koch presumably paid the producers the appropriate percentage from those proceeds, and the producers would have no further recourse against Koch.
 
 
 110
 We believe the court correctly found that Koch could not prove that it sustained three-quarters of the damages claimed, and that Koch did not prove that it would be liable in the future to pay producers for gas not sold merely because Koch collects on a judgment for its damages resulting from MDU's breach. The percentage-of-proceeds reduction in damages is affirmed.
 
 XIII. Prejudgment Interest
 
 111
 Koch argues that the District Court erred in refusing to grant Koch's request for prejudgment interest on the damages awarded. As this is a diversity case, the award of prejudgment interest is controlled by state law. California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse Co., 788 F.2d 1331, 1333 (8th Cir.1986). The relevant North Dakota statute reads as follows:
 
 
 112
 Every person who is entitled to recover damages certain or capable of being made certain by calculation, the right to recover which is vested in him upon a particular day, also is entitled to recover interest thereon from that day....
 
 
 113
 N.D.Cent.Code § 32-03-04 (1976) (emphasis added).
 
 
 114
 It is clear that the damages in this case are not capable of being made certain as required by the statute. We have here a series of contracts that defied ready interpretation as to damages upon breach, as this opinion and the orders of the court below demonstrate. That adjudication may eventually result in the calculation of a final award--which is, after all, the ultimate result whenever money damages are awarded--does not make the damages "certain or capable of being made certain" within the meaning of the statute. The ambiguities in the contracts and the legal and factual complexities attendant to determining an appropriate award of damages make the requested award of prejudgment interest improper. See Super Hooper, Inc. v. Dietrich & Sons, Inc., 347 N.W.2d 152, 156 (N.D.1984).
 
 
 115
 We affirm the District Court's refusal to grant prejudgment interest on the damages awarded Koch.
 
 XIV.
 
 116
 We remand to the District Court for consideration or reconsideration of four issues in accordance with this opinion:
 
 
 117
 1. Gas price under the McKenzie contract when market price decreased upon deregulation.
 
 
 118
 2. Whether the Phillips contract was materially altered by WBI without MDU's consent after delegation of the contract to WBI, and, if so, the extent to which MDU is liable on the altered contract.
 
 
 119
 3. Gathering fees due Koch under the operating agreements, if any.
 
 
 120
 4. Incidental damages due Koch, if any.
 
 
 121
 Because the District Court's resolution of the remanded issues may affect the amount of damages awarded, the judgment is vacated. The District Court shall fix a new damages award, and enter a new final judgment, after it has considered the remanded issues. In all other respects, the rulings of the District Court are affirmed.
 
 
 122
 Finally, we have taken with the case Koch's motion to strike MDU's reply brief or, in the alternative, portions thereof. The motion is granted to the extent that we strike those portions of MDU's reply brief related to issues that MDU did not cross-appeal. See Fed.R.App.P. 28(c). We have not considered these portions of the reply brief in reaching our decision on the merits of the case.
 
 
 
 *
 The HONORABLE ELMO B. HUNTER, Senior United States District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 MDU Resources Group's (MDU) predecessor was Montana-Dakota Utilities Company. In 1985, MDU formed Williston Basin Interstate Pipeline Company, the subsidiary responsible for MDU's interstate pipelines. MDU and/or WBI succeeded to the contracts made by their predecessors, so we will refer to the appellee/cross-appellant as MDU even if the nominal party to some of the agreements was actually Montana-Dakota Utilities or WBI. Part IV.C, infra, concerns an alleged material alteration of the Phillips contract by WBI without MDU's consent, so it is necessary there to differentiate between MDU and WBI
 
 
 [2]
 The Honorable Patrick A. Conmy, Chief Judge, United States District Court for the District of North Dakota
 
 
 [3]
 In a prescient remark, one commentator noted:
 Stated simply, then, it appears likely that in 1985, when significant quantities of natural gas are deregulated, controlling contract provisions will call for prices above the unregulated market-clearing price. Such a situation, unprecedented in the history of gas producer regulation, will put enormous pressure on the producer-pipeline relationship as governed by private contracts. If the parties are incapable of resolving their differences, the courts will be called upon to interpret enormously complex contract provisions.
 Richard J. Pierce, Jr., Natural Gas Regulation, Deregulation, and Contracts, 68 Va.L.Rev. 63, 99 (1982).
 
 
 [4]
 Much of the gas Koch gathers is casinghead gas, that is, gas produced from oil wells in conjunction with the extraction of crude oil. See 8 Howard R. Williams & Charles J. Meyers, Oil and Gas Law, Manual of Oil and Gas Terms 156 (8th ed. 1991) [hereinafter Oil and Gas Terms ]. Casinghead gas is expressed from the oil well at a pressure too low to be transported through the pipeline system. Compression in the field increases the pressure so that the gas can travel through the pipeline to the processing plant. Transcript at 62-63. The gas must be kept moving through the pipeline or to storage facilities, as it is difficult to shut it back without shutting down crude oil production. See id. at 64
 
 
 [5]
 Without the supply and market security provided by long-term contracts, investment in the large capital assets associated with the production, transportation, and consumption of gas would be substantially retarded
 Long-term contractual relationships are difficult to construct and maintain, however, because they require the parties to allocate risks decades before the contract expires.
 Richard J. Pierce, Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry, 97 Harv.L.Rev. 345, 354 (1983) (footnote omitted).
 
 
 [6]
 Under a take-or-pay clause in a gas purchase contract, the buyer must pay for the contracted volume of gas whether or not he takes the gas. See Oil and Gas Terms, supra note 4, at 1233. A take-and-pay clause requires the buyer to take and pay for the contracted volume or, upon his failure to take the gas, to pay the difference between contract price and market price, with the seller required to mitigate damages. Id. at 1232. Such clauses shift volume and price risks to the buyer. See Pierce, supra note 5, at 355
 
 
 [7]
 By letter dated May 6, 1987, MDU formally notified Koch that effective May 1, 1987, MDU would cease purchasing gas from Koch
 
 
 [8]
 Residue gas is the natural gas that remains after "wet" gas has been processed to remove liquid hydrocarbons. Oil and Gas Terms, supra note 4, at 1061, 1364
 
 
 [9]
 An Mcf is a thousand cubic feet, "[t]he standard unit for measuring the volume of natural gas." Oil and Gas Terms, supra note 4, at 701
 
 
 [10]
 See supra, note 7
 
 
 [11]
 Koch proceeded in this manner even though it knew MDU was having difficulty selling the natural gas supplies it already was committed to buy from Koch and others. Although some might view this as beggaring thy neighbor, it was permissible under the terms of the contract
 
 
 [12]
 One delegates contractual performance obligations and assigns contractual rights. III E. Allan Farnsworth, Farnsworth on Contracts § 11.10, at 125 (1990). As to these bilateral contracts, MDU assigned to WBI its rights to purchase natural gas from Koch; MDU delegated to WBI its duty to take or pay for the gas
 
 
 [13]
 A Btu is a British thermal unit, "[t]he amount of heat needed to raise the temperature of one pound of water one degree Fahrenheit." Oil & Gas Terms, supra note 4, at 130
 
 
 [14]
 Under the McKenzie contract, dated December 20, 1979, Koch and MDU agreed that the delivered gas
 shall not have a Btu content in excess of 1,100 Btu's per cubic foot. It is understood and agreed by the parties hereto that [Koch] may be required to inject air into the residue gas such that the surplus residue gas delivered to [MDU] will meet the maximum heating value specification set out above.
 McKenzie Contract p 5.2. On April 15, 1980, MDU assumed responsibility for the cost of injecting the natural gas and "agreed to pay Koch Hydrocarbon Company a cost of service fee for stabilizing the residue gas delivered pursuant to said Contract." Air Injection Letter Agreement of Apr. 15, 1980, at 1. The inert gas injection agreement replaced the air injection agreement in October 1982.
 
 
 [15]
 It is apparent from the record, from the parties' briefs, and from the District Court's opinions that, although MDU repudiated its contracts with Koch in May 1987, it nevertheless continued purchasing McKenzie gas from Koch and in fact was purchasing such gas at the time MDU advised Koch to stop injection
 
 
 [16]
 In Exhibit A to the McKenzie contract, the Btu content is specified in more detail. Koch was required to deliver gas with a heating value of not "less than 950 Btu per cubic foot nor greater than 1100 Btu per cubic foot." McKenzie Contract ex. A, p 2.1(i)
 
 
 [17]
 MDU does not appeal the District Court's refusal to credit MDU for the amounts it paid to Koch
 
 
 [18]
 The language pertinent to this issue is identical in each agreement: Lone Butte Operating Agreement of Aug. 4, 1982; Kordinowy Operating Agreement of Aug. 4, 1982; White Tail Operating Agreement of Sept. 2, 1982; Hunt Holler Operating Agreement of Sept. 2, 1982; Corral Creek Operating Agreement of Sept. 2, 1982
 
 
 [19]
 Because we hold that MDU did not demonstrate clear error in the court's finding that MDU's storage (or lack thereof) had no bearing on its failure to meet the terms of its contracts with Koch, any limitations FERC may or may not have placed on MDU's storage are irrelevant and thus are not considered by this Court
 
 
 [20]
 Koch claims it is entitled to "consequential" damages, but cites to the incidental damages provision of the U.C.C. as the authority supporting its right to recover such damages. See Brief of Appellant at 59