In the Matter of the ESTATE OF Kenneth G. HILL, Deceased.

Appeal of Nancy PIJAN, Claimant and Appellant.

Civ. No. 920075.

Supreme Court of North Dakota.

Nov. 9, 1992.

---

John T. Schneider of Schneider, Schneider & Schneider, Fargo, for claimant and appellant.

Jonathan T. Garaas (argued), of Garaas Law Firm, Fargo, for appellee Kathleen Hill.

Edward F. Klinger of Gunhus, Grinnell, Klinger, Swenson & Guy, Moorhead, Minn., attorney for appellee First Trust Co. of North Dakota, personal representative.

Arthur Warren Stokes, Wahpeton, for appellees Duane M. Hill, Sharon Fleischauer, and Brian J. Hill.

VANDE WALLE, Justice.

Nancy Pijan submitted a claim to the estate of Kenneth G. Hill for repayment of a series of alleged loans she made to Hill before his death. After the claim was disallowed by the personal representative, First Trust Company, North Dakota, N.A., Pijan petitioned the county court for the allowance of her claim. The county court denied her claim and she has appealed the denial. We affirm in part and reverse in part.

In 1969, Pijan was hired as Hill's personal and corporate bookkeeper. Pijan considered herself Hill's office manager and had access to all of his financial records. As Hill's corporate bookkeeper, Pijan kept the books of his various business entities including Polar Incorporated, Hill's corporation which owned Polar Package Place, a

Fargo off-sale liquor establishment. As Hill's personal bookkeeper, Pijan would, among other things, pay all his bills, record all his deposits, conduct all his banking, balance his checkbook, and negotiate certificates of deposit. Hill would routinely check Pijan's work for accuracy.

The relationship between Hill and Pijan developed into a close and personal one, culminating in a love affair. Without contradiction, Pijan testified she was a friend, business associate, personal confidant, bookkeeper, creditor, agent, and lover of Hill.

In 1972, Frank Baer began working at Polar Package Place and became its floor manager. In 1978, Baer as floor manager and Pijan as office manager approached Hill about purchasing Polar Inc., the holding corporation of Polar Package Place. At that time, Polar Inc. was owned by both Hill and his four children. The corporation redeemed their shares in an agreement between Hill and his children dated May 13, 1978. On May 19, 1978, with a down payment of $221.96, Baer and Pijan purchased all 49 shares of Polar Inc. for a total consideration of $500,000.

Of the $500,000 total consideration for the 49 shares of Polar Inc., $272,221.95 (49 shares multiplied by $5,555.55 per share) were financed through a promissory note to Hill. The $272,221.95 was to be divided equally between Baer and Pijan as "joint and several" debtors. The remaining $225,000 was borrowed from First National Bank in Fargo in the name of the corporation, Polar Incorporated. This loan through First National also allowed Pijan and Baer an inventory loan of $128,000 and an individual loan of $22,500 should she and Baer so choose. The loan agreement limited Pijan and Baer's salaries to a specified amount and required the furnishing of an annual financial statement of the business to both Hill and the bank.

When Pijan and Baer bought Polar Inc., Hill employed another bookkeeper, but Pijan remained in charge of the corporate offices and continued to be Hill's personal bookkeeper.

In 1983, Pijan sold her entire interest (24 1/2 shares) in Polar Inc. back to Polar Inc. (and thus to Baer) for $300,000.05. Baer and Pijan determined that $153,640.26 remained to be paid by them on their 1978 promissory note to Hill for the initial purchase of Polar Inc. The corporation agreed to pay Pijan's share of $76,820.13 (half of $153,640.26) to Hill. The remaining $223,-179.87 ($300,000.05 minus $76,820.13) would be paid to Pijan in the form of a $100,000 promissory note and $123,179.87 to be paid to Pijan at closing. Baer thereafter signed an "Assumption of Liabilities" which released and held free Pijan from any obligations under the 1978 initial purchase agreement.

The personal relationship between Hill and Pijan grew steadfast. On April 28, 1984, Hill asked Pijan to marry—this being noted in Hill's personal diary in the April 28, 1984 entry. Pijan refused Hill's proposal, apparently because she had planned to move to Bismarck and thought the long distance between the two would make continuing a relationship difficult. One month later, Pijan moved to Bismarck to take over the management of Hill's Bismarck liquor establishment, Polar Package Place. Pijan was an officer and owned 10,000 shares of Dakota Gold Inc., the holding corporation of the Bismarck Polar Package Place. Other shareholders of Dakota Gold Inc. were Hill and his four children. Pijan remained in Bismarck as manager of Polar Package Place until Hill's death.

Despite the physical distance between them, Hill and Pijan remained close and intimate—so close in fact that Hill would take his financial records to Bismarck or Pijan would travel to Hill's farm, not only to continue their intimate relationship, but also to prepare and reconcile Hill's financial records. When Hill would travel to Bismarck, he stayed at Pijan's house, and when Pijan would travel to Hill's farm, she stayed at Hill's house.

In December 1984, Pijan wrote a check to Hill for $30,000. In Hill's personal ledger this money was marked as "payable," showing that the money was due and payable to Pijan—indicative of a loan. Submit-

ted into evidence was Hill's personal diary which bore the notation "Borrowed 30M from Nancy to Deposit" on the December 31, 1984 entry. The $30,000 was paid back to Pijan in August of 1985 with no interest. This transaction is not a part of this suit. Pijan presumably submitted it for the purpose of showing prior informal loan dealings between her and Hill.

On September 15, 1987, Pijan wrote Hill a check for $100,000. A notation on Hill's checking account deposit slip in that amount made that same day has the notation "N A Pijan" in Pijan's own handwriting, the "N A Pijan" being Pijan's given name initials and her surname. This money was used by Hill to buy the "Mikkelson property," a farm Hill was buying. Hill eventually purchased this land and it is now a part of the estate. There is no writing to evidence this transaction as a loan.

On January 2, 1988, Pijan wrote Hill a check for $45,000. A notation on Hill's checking account deposit slip in that amount made on that same day has the notation "N A Pijan" in Pijan's own handwriting. This money was used to cover overdrafts in Hill's account and to cover an Internal Revenue Service amount due based on Hill's 1987 estimate. In Hill's personal ledger, Pijan wrote "payable" next to the notation of her check to Hill, showing that the money was due and payable to her by Hill—indicative of a loan. There is no other writing to evidence this transaction as a loan.

On January 18, 1988, Pijan wrote Hill a check for $15,000. A notation on Hill's checking account deposit slip in that amount made on the same day has the notation "N A Pijan" in Pijan's own handwriting. This money was also used to cover overdrafts in Hill's account and to cover an Internal Revenue Service amount due based on Hill's 1987 estimate. In Hill's personal ledger, Pijan wrote "payable" next to the notation of her check to Hill, showing that the money was due and payable to her by Hill—indicative of a loan. There is no other writing to evidence this transaction as a loan.

On or about November 2, 1988, Pijan wrote Hill a check for $25,000. On November 2, 1988, Hill deposited $50,000 into his checking account. The deposit slip for this transaction bears two notations in Hill's handwriting: a $25,000 check deposited from Dakota Gold, Inc., and a $25,000 check deposited from "N A P," indicating Pijan's given and surname initials. The money from Pijan was to be used for the payment of various bills and payments to be paid on the farm land. In Hill's personal ledger Pijan wrote "payable" next to the notation of both the checks from Pijan and Dakota Gold, showing that the monies were due and payable to Dakota Gold and Pijan—indicative of a loan. The money from Dakota Gold was subsequently repaid to Dakota Gold. There is no other writing to evidence this transaction as a loan by Pijan.

Also, on or about November 2, 1988, Pijan purchased with her own money draperies and blinds for Hill's farm in the amount of $2709.58 from Sears.

In early 1989, Hill wrote out an informal statement of his assets and liabilities. This statement was in Hill's handwriting and Pijan was not present when the statement was drawn up. Under the "liabilities" heading is an entry of "Nancy P. ?150,-000—". This entry indicates that Hill knew he owed Pijan around $150,000, but he was not sure of the amount. This again is indicative of a loan agreement or agreements between the two.

Hill died from a stroke on June 30, 1989. Thereafter, Pijan submitted a claim against Hill's estate for repayment of (1) the $100,-000 September 15, 1987 check, (2) the $45,-000 January 2, 1988 check, (3) the $15,000 January 18, 1988 check, (4) the $25,000 November 2, 1988 check, and (5) the $2,709.58 Sears bill. All claims were denied by both the personal representative and the subsequent county court order.

## I. Express Contract

In this case, it is alleged that Pijan and Hill entered into four oral loan contracts. Hill's estate claims that these were not loans but gifts. Oral contracts present particular problems of proof. First

and foremost, Pijan had the burden of proving the claim of an oral contract by a preponderance of the evidence. *Midland Oil & Royalty Co. v. Schuler*, 126 N.W.2d 149 (N.D.1964). The evidence to support the claim must have produced the stronger impression and be more convincing when weighed against the evidence in opposition thereto. *Christensen v. Iowa State Highway Comm'n*, 252 Iowa 1351, 110 N.W.2d 573 (1961). In meeting this burden, the terms of an oral contract can obviously be established only by extrinsic evidence. A determination of the existence of an oral contract is made by the trier of fact and will be reversed only if clearly erroneous. *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417 (N.D.1979); NDRCivP 52(a).

A contract may be written or oral but must, essential to its existence, have parties capable of contracting, the consent of the parties, a lawful object, and sufficient cause or consideration. NDCC § 9–01–02. More specifically, a contract requires "an offer, and acceptance of that offer, and mutual acceptance and understanding of the offeror and offeree as to the terms of the legally enforceable obligation thus incurred." *Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352, 355 (N.D. 1986). Implicit in these requirements is the notion that to be a valid and enforceable contract, it must be reasonably definite and certain in its terms so that a court may require it to be performed. The contract must be definite enough so as to ascertain what is required of the parties as courts will not uphold agreements which are indefinite and uncertain as to the parties' obligations. *Mag Constr. Co. v. McLean County*, 181 N.W.2d 718 (N.D.1970).

In determining the essential terms of an oral loan contract, both parties rely on *Union State Bank v. Woell*, 434 N.W.2d 712 (N.D.1989). In *Woell*, we set forth a checklist of terms essential to prove the existence of an agreement to lend money in the future. The court noted, "[e]ssential terms of an oral contract to continue lending money in the future include the amount and duration of the loans, interest rates, and,

where appropriate, the methods of repayment and collateral for the loans, if any." *Id.* at 717. *Woell* and its progeny are not applicable to the present instance since Pijan and Hill did not contract to "continue lending money in the *future*," but allegedly contracted to make a *present* loan. Any alleged contract entered into between Pijan and Hill would entail a present contract to loan money, not an agreement of money to be loaned and not an agreement to continue to loan money in the future. Strict adherence to the *Woell* test is thereby not required.

A loan of money is defined in section 47–14–01, NDCC, as "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrowed." All one needs to show is (1) a delivery, (2) of money, (3) to another, (4) an agreement by the latter, (5) to return the money at a future time, and (6) in a sum equivalent. In determining these terms, it is important to note that, by its very nature, an implied in fact agreement is not as detailed as a written agreement formally negotiated. *Mathews v. Twin City Constr. Co. Inc.*, 357 N.W.2d 500 (S.D.1984). Not every term of the agreement need be spelled out—some may be implied in fact—so despite any uncertainties surrounding the transaction, if money passes from one individual to another with an understanding that it be repaid, the law will supply the missing details. *Hook v. Crary*, 142 N.W.2d 140 (N.D.1966). For instance, an interest rate need not be noted, for the law will imply a rate at 6% where none has been spelled out. NDCC § 47–14–05. *Cf. Nissen v. Dews*, 43 Colo. App. 228, 603 P.2d 966 (1979) [interest need not be a subject of a contract, nor incident to it]. Likewise, an exact time for repayment also need not be spelled out for the law will imply that it must be repaid within a reasonable time. NDCC § 9–07–22; *Hook, supra;* Williston, *Contracts* § 38 (3d ed.1957). Valid loan agreements have been found even though their terms do not include interest or a specified date for repayment. *Nissen, supra.*

■ Missing or vague terms may also be determined by looking to the course of dealings between the parties. The Restatement notes that some terms of the contract may be missing or left to be agreed upon, but if the essential term or terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract. *Restatement (Second) of Contracts* § 33 (1979). However, where there is a course of dealing between the parties, there is some method and basis by which the missing terms of an agreement may be supplied. *First Nat'l Bank v. Logan Mfg. Co.*, 577 N.E.2d 949 (Ind.1991). Pijan and Hill entered into a previous loan agreement in December of 1984. This oral transaction was not evidenced by any writing, but Hill nonetheless acknowledged his debt to Pijan and paid the money back to her within the year. This loan between Pijan and Hill was interest-free, so interest is not necessarily implied in other course-of-dealing transactions. Similarly, although no repayment time duration can be specified, the course of dealing in this transaction indicated that Hill soon thereafter paid back the $30,000 to Pijan within a year—in conformity with the "reasonable time" duration as implicated by section 9–07–22, NDCC.

■ Pijan's burden was only to show by a preponderance of the evidence that a loan relationship was established. *Midland Oil, supra.* Only reasonable certainty that such an agreement existed need be shown. All minor details need not be proven—the degree of definiteness and certainty required need only be reasonable. 17A Am.Jur.2d *Contracts* § 193 (1991). The court ruled that Pijan failed to show by a preponderance of the evidence that the four transactions were loans to Hill, but the court did not analyze the requisites for an underlying contract or the underlying basis for a loan, nor consider these bases in the context of an alleged oral agreement.

The court noted that there "is no such writing that proves that these monies represented loans" and that "[n]o document shows the repayment terms, the duration of the loan, the interest rate, the methods of repayment, the collateral (if any) for the loan." But as discussed above, a party does not need a document reciting these terms as loans may be oral and, even if these terms are required, they may be supplied by law or by the course of dealing. Certainly, as the county court wrote, it "would be helpful in proving the existence of such a loan if a written loan agreement could be produced," but the lack of a written agreement is alone an improper basis to find no agreement between the parties. The court stated that "the failure of two knowledgeable business persons to commit a loan agreement to writing shocks the court as improbable...." Insofar as that conclusion is the reason for denying Pijan's claim, it is not the proper framework for a determination that a loan agreement did not exist under the evidence in this case.

Of paramount importance to the trial court was the assumption that since Pijan and Hill were business-minded, they should have known better than to not leave a paper trail showing a loan and its terms. This "if, then" hypothesis (if they are business people, then they are assumed to put all loan agreements in writing) is unsupported by any case law and is unsound in principle. It ignores the previous course of dealing between the two, and rather reflects their course of dealing with strangers. Except for the fact that the two parties were learned in the business realm, which in and of itself is not a proper element on which to base such a negative inference, the great weight of evidence supports the existence of a loan. *E.g., Livingston v. Tapscott*, 585 So.2d 839 (Ala. 1991) [bank statements, cancelled checks, and deposit slips held sufficient to evidence a loan].

## II. Contract Implied at Law

■ The trial court held only that no express loan existed, but did not further describe the nature of the transfer. When the trial court did not find an express loan contract between Pijan and Hill,[1] but did

---

**1.** A finding of an express contract negates a possible finding of an implied one as the two are mutually exclusive. NDCC § 9–06–01 ["A contract is either express or implied."]; *First*

not find that the transfer was a gift,[2] it should have considered possible recovery under an implied-contract theory. A contract implied at law permits the court to apply an equitable remedy while recognizing it is an obligation imposed by law to do justice even though it is clear that no promise was ever made. *Gate City S. & L. Ass'n v. International Bus. Mach. Corp.*, 213 N.W.2d 888 (N.D.1973). The existence and terms of an obligation are manifested by conduct that can be both acts and words. NDCC § 9–06–01.

■ Contracts implied in law are fictions of the law, actually not contracts, created on principles of unjust enrichment and presumption of performance of duty, without regard to the assent of the parties. 17 C.J.S. *Contracts* § 6 (1963). The essence of an implied-at-law contract is the receipt of a benefit by a decedent during his life which it would be inequitable for the decedent to have retained without payment. If it would be inequitable for the decedent to retain the benefit, the estate is said to be unjustly enriched. *Midland Diesel Serv. & Engine v. Sivertson*, 307 N.W.2d 555 (N.D.1981).

■ Unjust enrichment is a broad, equitable doctrine which rests upon quasi or constructive contracts implied by law to prevent a person from unjustly enriching themselves at the expense of another. *Cavalier County Memorial Hosp. Ass'n v. Kartes*, 343 N.W.2d 781 (N.D.1984). The doctrine serves as a basis for requiring restitution of benefits conferred in the absence of an express contract. *D.C. Trautman Co. v. Fargo Excavating Co.*, 380

N.W.2d 644 (N.D.1986). To recover under a theory of unjust enrichment, one must prove five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of a justification for the enrichment and impoverishment; and (5) an absence of a remedy provided by law. *A & A Metal Bldgs. v. I–S, Inc.*, 274 N.W.2d 183 (N.D.1978). A trial court's finding that a party has or has not been unjustly enriched is fully reviewable as a matter of law by this court. *Midland Diesel, supra;* Rule 52(a), NDRCivP. The trial court did not consider the applicability of this doctrine to this case.

■ If, as the trial court found, there was not an express oral agreement between the parties, the court should have considered the possibility of an implied contract to determine if Pijan was entitled to relief as she was left without an adequate remedy at law. *Compare, D.C. Trautman, supra,* at 646 ["the trial court found that Trautman had an oral agreement with Fargo Excavating.... Accordingly, Trautman had an adequate remedy at law ... which precludes alternative equitable relief"]. When a court is asked to consider an equitable remedy, it must look to, among other things, the adequacy of a legal remedy. A fundamental principle of equity is that a party is not entitled to equitable relief if there is a remedy provided by law which is equally adjusted to rendering complete justice. In other words, the equitable remedy must be better adjusted to rendering complete justice than the legal remedy.[3] The legal remedy in

---

*Nat'l Bank of Belfield v. Burich*, 367 N.W.2d 148 (N.D.1985); *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 791 (Iowa 1985) ["An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supercedes the latter."]. But finding that no express contract exists does not negate the possibility of an implied contract.

**2.** A finding of a gift necessarily defeats a finding of unjust enrichment, absent circumstances of fraud, undue influence, etc., for equity cannot generally force the repayment of a gift. *Lawlis v. Thompson*, 137 Wis.2d 490, 405 N.W.2d 317 (1987). If one confers a benefit gratuitously, the retention of that benefit without payment is

not considered unjust. *Matter of Estate of Zent*, 459 N.W.2d 795 (N.D.1990) [citing *Cole v. Cole*, 517 N.E.2d 1248 (Ind.Ct.App.1988) ].

**3.** There is authority from other jurisdictions and some North Dakota case law that for a party to be entitled to equitable relief, that relief must be *better* adjusted to rendering complete justice than a legal remedy. *A & A Metal Bldgs. v. I–S, Inc.*, 274 N.W.2d 183 (N.D.1978); *Graven v. Backus*, 163 N.W.2d 320, 327 (N.D.1968) ["... that the plaintiff may have a remedy at law by an action for damages does not prohibit an equity court from assuming jurisdiction if the equitable remedy is *better* adapted to render a more perfect and complete justice than the rem-

Pijan's case is inadequate if no recovery for damages may be had, for if no express contract is found, the legal remedy fails. An equitable remedy would therefore be better adjusted to rendering complete justice. Alternatively then, Pijan is allowed to turn to equity. The trial court should have discussed the applicability of equitable remedies in general and from there the specific requirements for recovery under unjust enrichment following the above noted five points.

### III. Notice of the Claim

▪▪▪▪ The estate alleges that Pijan is foreclosed from asserting such an equitable basis for recovery because she did not specifically plead it in her complaint. The estate contends that recovery on an implied contract is not available to Pijan because her complaint did not demonstrate the inadequacy of legal remedies. *See Wolf v. Anderson,* 334 N.W.2d 212 (N.D.1983). The argument that the pleadings do not demonstrate the inadequacy of legal relief and that Pijan did not clearly and explicitly request equitable relief is not determinative as the form of the prayer for relief need not strictly control the area of subject-matter jurisdiction in equity; rather, the court must consider what the complaint really seeks. *Burris v. Cross,* 583 A.2d 1364 (Del.Super.1990). With the adoption of notice pleading in North Dakota, the formal character of the complaint no longer strictly determines the cause of action. *Harrington v. Harrington,* 365 N.W.2d 552 (N.D.1985). Notice pleading only requires (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks. Rule 8(a), NDRCivP. Pleadings are to be liberally construed as to do substantial justice. Rule 8(f), NDRCivP.

▪▪▪▪ Some courts have ruled that a plaintiff who pleads an express contract cannot recover upon an implied contract. *Christensen, supra.* North Dakota courts however have jurisdiction to provide a remedy where none exists at law—even if the parties have not specifically requested an equitable remedy—whenever the pleadings sufficiently give notice of the party's right and demand a judgment pursuant to Rule 8, NDRCivP. *Harrington, supra; A & A Metal, supra.* As the Michigan Supreme Court noted,

> "The primary function of a bill of complaint is to apprise the court and the defendant of the grounds or basis of the plaintiff's claim. To do this, the plaintiff must allege all of the necessary facts upon which he bases his cause of action. Failure to state those facts, or others from which they might *reasonably* be inferred, is failure to state a cause of action."

*A & C Eng'g Co. v. Atherholt,* 355 Mich. 677, 95 N.W.2d 871, 874 (1959) [emphasis added]. This concept stems from the fusion of law and equity that has been the law in North Dakota since the adoption of the 1863 Field Code which places authority to grant equitable or legal relief in courts of general jurisdiction. *Ziebarth v. Kalenze,* 238 N.W.2d 261 (N.D.1976); *Graven v. Backus,* 163 N.W.2d 320 (N.D.1968). Therefore, if the original complaint shows reason to grant relief, the court may consider and determine all equitable matters

edy at law."] [emphasis added]; *Warren Tool Co. v. Stephenson,* 11 Mich.App. 274, 161 N.W.2d 133, 147 (1968) ["... the existence of a legal remedy does not prevent equity from decreeing a *more complete* remedy."] [emphasis added]. The modern phraseology trend in North Dakota cases and among scholars is that if there is a legal remedy *equally* adjusted to rendering complete justice, the court will not generally apply equitable relief. *Omlid v. Sweeney,* 484 N.W.2d 486, 490 (N.D.1992) ["A fundamental principle of equity is that a 'party is not entitled to equitable relief if there is a remedy provided by law which is *equally* adjusted to

rendering complete justice.'"] [emphasis added]; *D.C. Trautman Co. v. Fargo Excavating Co.,* 380 N.W.2d 644 (N.D.1986); *State v. Hooker,* 87 N.W.2d 337 (N.D.1957); *McGurren v. City of Fargo,* 66 N.W.2d 207 (N.D.1954) ["But a legal remedy in order to be adequate in the sense involved in determining the jurisdiction of equity must be as practical and *as efficient* to the ends of justice and its prompt administration as the remedy in equity."] [emphasis added]; Dobbs, *Handbook on the Law of Remedies* § 2.5, p. 57 (1973). No matter how one chooses to phrase it ["better" or "equal"], the result is the same.

that are properly incidental to the complete determination of the subject matter of the case and to do complete justice between the parties. *Cf. Graven, supra.*

In any event, section 30.1–19–04, NDCC, sets forth the requirements for presenting claims against a decedent's estate, and provides in pertinent part that "[t]he claimant may deliver or mail to the personal representative a written statement of the claim indicating its basis ... or may file a written statement of the claim, in the form prescribed by rule, with the clerk of court." The statute does not require undue precision in the framing of such claims by concluding that "[f]ailure to describe the security, the nature of any uncertainty, and the due date of a claim not yet due does not invalidate the presentation made." NDCC § 30.1–19–04(1). In addition, the statement of purpose prefacing North Dakota's Probate Code provides that "[t]his title shall be liberally construed and applied to promote its underlying purposes and policies." NDCC § 30.1–01–02(1). *See also DeMentas v. Estate of Tallas,* 764 P.2d 628 (Utah Ct.App.1988) [construing similar statutes].

A conclusion that Pijan should not be permitted to recover amounts under an implied contract because her petition seeks recovery on the express oral contract allegedly made between the parties as a result of their action is a more narrow view of notice pleading than we have adopted in North Dakota. Pijan's claim gives fair notice to the estate of the nature of the claim. The pleaded cause of action was a loan of money under the legal declaration that a loan of money is a delivery by a lender and the receipt by a borrower of a given sum, upon an agreement, expressed or implied, to repay the sum loaned. NDCC § 47–14–01. The petition specifically describes the actions which led to the alleged loan and the petition sufficiently apprises the estate of the incidents giving rise to the claim and the general nature of the action. *Jablonsky v. Klemm,* 377 N.W.2d 560 (N.D.1985); *Harrington, supra.* From this appraisal, the personal representative has all the in-

formation needed to investigate the claim and decide whether to pay it, fight it, or settle it. It is inconsequential that the claim did not articulate particular legal theories upon which payment of the claim would most appropriately be premised. *DeMentas, supra.* Neither our probate statutes nor the probate forms require a formality in the pleading to the extent of pleading legal theories. It is thereby sufficient under our rules of notice pleading for the county court to have considered all equitable remedies.[4]

### IV. Conclusion

The evidence clearly entitles Pijan to recover $185,000.00 under either a theory of a loan or a theory of unjust enrichment. Because we are left with a definite and firm conviction that a mistake has been made, we reverse the order of the trial court denying Pijan's claim for $185,000.00 and direct that an order be entered allowing Pijan's claim for that amount with no interest to the date of filing the claim, but with interest pursuant to section 47–14–05, NDCC, from the date of the claim to the date of entry of the trial court order. After the date of entry of the order, interest will accrue pursuant to section 28–20–34, NDCC. Based upon the evidence presented at the trial court and in light of the above analysis, the order denying the claim for the draperies and blinds is affirmed.

ERICKSTAD, C.J., MESCHKE and LEVINE, JJ., and EVERETT NELS OLSON, District Judge, concur.

EVERETT NELS OLSON, District Judge, sitting in place of JOHNSON, J., disqualified.

---

**4.** In this opinion, we are not considering matters which must be affirmatively plead. *See*  Rule 8(c), NDRCivP.