# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-4058

_____

| | |
|---|---|
| JN Exploration & Production, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| | * |
| v. | * |
| | * |
| Western Gas Resources, Inc., | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 96-4134

_____

| | |
|---|---|
| JN Exploration & Production, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| v. | * |
| | * |
| Western Gas Resources, Inc., | * |
| | * |
| Defendant - Appellee. | * |

Appeals from the United States
District Court for the
District of North Dakota.

_____

Submitted:  October 20, 1997
Filed:      September 1, 1998

_____

Before RICHARD S. ARNOLD, Chief Judge,[1] LOKEN and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Western Gas Resources, Inc. (Western) appeals from the district court's denial of its motion for summary judgment and from the grant of JN Exploration & Production's (JN) motion for summary judgment. JN cross-appeals, contesting the district court's denial of JN's motion for attorneys' fees and the inclusion of an indemnity clause in the judgment. JN has additionally moved to strike portions of Western's reply brief. We reverse and remand on Western's appeal, we deny JN's motion to strike, and we do not reach JN's cross-appeal.

**I.**

JN owns or leases mineral rights to various properties in Billings County, North Dakota. JN is primarily concerned with the production of oil, but in producing its oil, JN necessarily produces a certain amount of natural gas. Years ago, this gas was "flared" at the site of the well. However, environmental legislation enacted in the late 1970s created incentives for oil producers to begin collecting the otherwise "flared" gas for sale. On June 4, 1979, JN's predecessor-in-interest entered into a gas sales and purchase contract with Western.[2] Pursuant to this contract, JN agreed to sell, and Western agreed to buy, "all the gas . . . now or hereafter produced from the said lease/s

_____

[1]The Honorable Richard S. Arnold stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 17, 1998. He has been succeeded by the Honorable Pasco M. Bowman, II.

[2]JN is the successor-in-interest of Canterra Petroleum, Inc., which was in turn the successor-in-interest of Al-Aquitaine Exploration, Ltd. Similarly, Western Gas Resources is the successor-in-interest of Western Gas Processors, Ltd. In the interests of clarity, we refer to the producer as JN and the processor as Western throughout.

and land/s" through 1999. (Appellee's App. at 34.) The parties agreed that Western would construct a processing facility near the wells at which Western would process the gas it bought from JN for resale by Western. The contract provided that Western would receive title to the gas upon delivery at the wellhead. Pursuant to the contract, JN would not be paid for the natural gas delivered to Western until such gas was processed and sold by Western, and the price paid by Western to JN would be equal to "fifty percent of the net sales proceeds" received by Western for the processed gas when Western sold it. Once Western had reached "payout" (i.e., once it had recouped the costs of constructing and operating its plant), JN's compensation would rise to sixty percent of the net sales proceeds.

JN's contract with Western did not specify at what price or to whom Western would resell the processed gas. However, JN's predecessor had selected Western over several competing processors, and one factor militating in favor of Western was Western's then existing contract with Montana Dakota Utilities Co. (MDU). On March 16, 1979—several months before signing the gas sales and purchase contract with JN—Western had entered into a gas purchase contract with MDU pursuant to which MDU promised to purchase all of the plant's production up to 10,000,000 cubic feet of gas per day from Western. At that time, MDU had the only interstate gas pipeline in the area and was the only readily accessible market for processed natural gas. The contract included a "take-or-pay" clause which obligated MDU, through 1999, to pay for the daily contract quantity of gas even if it did not in fact take that amount. MDU agreed to pay the highest price permitted under federal price regulations. Fifteen months after signing the contract with JN, Western negotiated an amendment to its contract with MDU pursuant to which MDU increased its maximum take to 30,000,000 cubic feet per day.

In the early 1980s, changes in the regulatory structure led to a significant oversupply of natural gas. As a result, MDU was unable to take the amount of processed gas it was obligated to purchase under its contract with Western. As a

result, in 1983, 1984, and 1985, MDU requested a short-term abatement in its required take from Western's processing facilities. In each of those years, Western agreed to such reduction. As partial consideration, MDU agreed to pay an elevated price for the gas it did buy during each of those years.

In 1986, MDU[3] again requested a temporary abatement of its take-or-pay responsibilities. This time Western refused. On May 8, 1987, MDU and Western entered into a settlement, pursuant to which Western released MDU from its take-or-pay obligations and waived all claims against MDU. (See Appellee's App. at 127-31.) Western additionally released MDU from the price requirements of the 1979 contract. In consideration for these alterations, MDU agreed to pay Western three "annual commitment fees" totaling $15,000,000. (Id. at 128.)

On June 30, 1987, Western sent a letter to each of its producers, including JN, notifying them that "negotiations with [MDU] have resulted in a revision of the sales contract resulting in [MDU] assuring Western of continued transportation but significantly altering [MDU's] obligation to purchase gas." (Id. at 132.) Western made clear that MDU would no longer provide "any significant market" for gas sold from Western's processing facility. (Id.) However, Western never notified JN of the $15,000,000 in annual commitment fees it was receiving from MDU.

In the very same letter, Western announced that it would begin purchasing processed gas from the Western plant in the same daily quantities and at the same per-unit price that MDU had been purchasing since the beginning of 1987. (See id. at 132.) It wrote that it did so because "[i]t is Western's opinion that maintaining a market for the gas that has been purchased by [MDU], at a price consistent with [MDU's] previous

---

[3]MDU had been succeeded at this point by its wholly-owned subsidiary Williston Basin Interstate Pipeline Co. For the sake of clarity, we refer to both MDU and its subsidiary simply as MDU.

purchases, is important to . . . [Western's plant] and to Western's producers behind the plant." Id.

In 1993, JN received a communication from the North Dakota State Land Department which made reference to the $15,000,000 Western had received pursuant to its settlement with MDU. Less than one month later, JN initiated this action in the District of North Dakota. JN claimed that it was entitled to a portion of the $15,000,000 under several contract theories or under an unjust enrichment theory. Both parties moved for summary judgment. The district court granted summary judgment for JN on its unjust enrichment claim. Western appeals both from the grant of summary judgment for JN and from the denial of its own motion for summary judgment. JN cross-appeals, contesting the denial of its motion for attorneys' fees and the inclusion of an indemnity clause in the judgment.

## II.

The district court held, in relevant part, "[t]hat although the negotiated settlement of the 'take-or-pay' contract was done in good faith and for the probable market advantage of producers and processor, the processor has been *unjustly enriched*, and under the controlling law of the Eighth Circuit, plaintiff is entitled to relief . . . ." (Appellant's App. at 21 (emphasis added).) The district court does not appear to have considered any of JN's contract claims, and we therefore concentrate our analysis on the unjust enrichment theory on which the court granted relief.

A.    Standard of Review and Choice of Law

We review the district court's grant of summary judgment for JN de novo, applying the same standard as the district court. Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992). In so doing, we construe the facts in the light most favorable to Western, and we afford Western the benefit of all reasonable inferences.

<u>Watson v. Jones</u>, 980 F.2d 1165, 1166 (8th Cir. 1992). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>Id.</u>; Fed. R. Civ. P. 56(c).

Notwithstanding the district court's invocation of "the controlling law of the Eighth Circuit," it is axiomatic that federal courts apply state substantive law in diversity suits. <u>See</u> <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938); <u>Hiatt v. Mazda Motor Corp.</u>, 75 F.3d 1252, 1255 (8th Cir. 1996). We review de novo the district court's application of state law. <u>First Colony Life Ins. Co. v. Berube</u>, 130 F.3d 827, 829 (8th Cir. 1997). Where state law is ambiguous, we predict how the state's highest court would resolve the issue. <u>Id.</u> The parties agree that North Dakota law controls, and we therefore apply applicable North Dakota statutes and precedents.

B.     North Dakota Precedents

"Unjust enrichment is a broad equitable doctrine *which rests upon quasi or constructive contracts implied by law* to prevent a person from unjustly enriching [himself] at the expense of another." <u>In re Estate of Hill</u>, 492 N.W.2d 288, 295 (N.D. 1992) (emphasis added); <u>see also</u> <u>D.C. Trautman Co. v. Fargo Excavating Co.</u>, 380 N.W.2d 644, 645 (N.D. 1986) ("The doctrine [of unjust enrichment] rests upon quasi-contractual principles[.]"); <u>First Nat'l Bank of Belfield v. Burich</u>, 367 N.W.2d 148, 154 (N.D. 1985) ("The equitable remedy of unjust enrichment generally rests upon the concept of quasi or constructive contract implied by law[.]"); <u>Sykeston Township v. Wells County</u>, 356 N.W.2d 136, 140 (N.D. 1984) (same). In fact, quasi contract and unjust enrichment are two terms for the same theory of relief. <u>See, e.g.,</u> <u>Dove Valley Bus. Park Assocs., Ltd. v. Board of County Comm'rs</u>, 945 P.2d 395, 403 (Co. 1997) (en banc) ("Unjust enrichment [is] also known as a quasi contract[] or contract implied in law[.]"), <u>cert. denied</u>, 118 S. Ct. 1302 (1998); <u>Henning v. Security Bank</u>, 564 N.W.2d 398, 403 (Iowa 1997) (unjust enrichment is a "modern designation[] for the older terms of quasi contracts or contracts implied in law").

Under North Dakota law, courts may only apply quasi contractual principles in the absence of a valid express or implied in fact contract.  See, e.g., Estate of Hill, 492 N.W.2d at 294-95 n.1 (N.D. 1992) ("A finding of an express contract negates a possible finding of an implied one as the two are mutually exclusive. . . . 'An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter.'") (quoting Chariton Feed & Grain, Inc. v. Harder, 369 N.W.2d 777, 791 (Iowa 1985)); Cavalier County Mem. Hosp. Assoc. v. Kartes, 343 N.W.2d 781, 785 (N.D. 1984) (implied contract cannot exist where express contract exists relative to same subject matter); Beck v. Lind, 235 N.W.2d 239, 250 (N.D. 1975) ("A quasi contract, implied in law, arises where a transaction between parties gives them mutual rights or obligations, but *does not involve an express agreement between them*.") (emphasis added).

Because unjust enrichment is synonymous with quasi contract, and because in North Dakota quasi contractual principles find no application in the face of an express contract, it follows necessarily that in the face of an express contract, an action for unjust enrichment cannot lie.  The Supreme Court of North Dakota has repeatedly recognized this, stating, "the doctrine [of unjust enrichment] serves as a basis for requiring restitution of benefits conferred *in the absence of* an express or implied in fact contract." Sykeston Township, 356 N.W.2d at 139 (emphasis added); see also D.C. Trautman Co., 380 N.W.2d at 645 (unjust enrichment applies in the absence of an express or implied in fact contract); Burich, 367 N.W.2d at 154 (same).[4]  In Burich, the

---

[4]This accords with the resolution of the matter in other jurisdictions.  See, e.g., Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 408-09 (9th Cir. 1992) (Arizona law) ("'[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application[.]'") (quoting Brooks v. Valley Nat'l Bank, 548 P.2d 1166, 1171 (Ariz. 1976)); Thurston v. Cedric Sanders Co., 125 N.W.2d 496, 498 (S.D. 1963) (South Dakota law) ("There is no question but what, where there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise, or suit on quantum meruit.") (internal quotations omitted); see also Murray v. ABT Assocs., Inc., 18 F.3d 1376, 1379 (7th Cir. 1994) (applying Illinois law); In re

Supreme Court of North Dakota highlighted the incompatibility of unjust enrichment and an express contract when it concluded, "[i]n this instance, an express contract existed between Burich and the Bank and therefore it was error to rely on the theory of unjust enrichment." 367 N.W.2d at 154. In short, because unjust enrichment is grounded in quasi contract, where, as here, the parties have voluntarily entered into an *express written* contract which defines the rights of each, unjust enrichment is a *non sequitur*.[5]

The express written contract between Western and JN provided that JN would receive compensation from Western equal to a percentage of "net proceeds from the sale of gas." JN does not argue that the contract had been rescinded or that it was invalid or unenforceable at the time of Western's alleged breach. Rather, the sole issue presented in this case is whether the $15 million Western received in settlement of its contract with MDU constitutes such "net proceeds" under the terms of the JN-Western contract. JN's remedy therefore lies in contract rather than in quasi contract.

---

Chateaugay Corp., 10 F.3d 944, 957 (2d Cir. 1993) (New York law); Harden v. TRW, Inc., 959 F.2d 201, 204 (11th Cir. 1992) (Georgia law); Marple v. Kurzweg, 902 F.2d 397, 401 (5th Cir. 1990) (Louisiana law).

[5]Three cases from the 1970s suggest that the Supreme Court of North Dakota had not as of then fully worked out this doctrine. See Cargill, Inc. v. Kavanaugh, 228 N.W.2d 133, 140 (N.D. 1975) (in the *absence* of "unjust enrichment, fundamental unfairness, or miscarriage of law requiring intervention of equity," court's equitable powers may not be invoked in a contract case); Fiebiger v. Fischer, 276 N.W.2d 241, 246 (N.D. 1979) (same, citing Kavanaugh); Trauger v. Helm Bros., Inc., 279 N.W.2d 406, 414 (N.D. 1979) (same, citing Kavanaugh). However, in none of these cases did the Supreme Court of North Dakota find unjust enrichment or award equitable relief. More importantly, as discussed below, the Supreme Court of North Dakota has made clear in the intervening years that the existence of a valid contract between the parties to a dispute bars relief on a theory of unjust enrichment.

C.    Eighth Circuit Precedents

JN argues that a different result is required by Klein v. Arkoma Prod. Co., 73 F.3d 779 (8th Cir.), cert. denied, 117 S. Ct. 65 (1996), and Frey v. Amoco Prod. Co., 603 So.2d 166 (La. 1992) (answering certified question) (subsequent history omitted).  We disagree.

In Klein v. Arkoma, this court determined that, *under Arkansas law*, a lessor was entitled to share in proceeds acquired by the lessee in a settlement of take-or-pay obligations.  See 73 F.3d at 786.  In so doing, we invoked the "Harrell rule," writing, "[B]ecause the evidence establishes as a matter of law that Jones and McCoy settled the take-or-pay claims, and because the Harrell rule entitles lessors to share in all proceeds from the land, we hold that the royalty owners are entitled to recover from Jones and McCoy on their unjust enrichment claim."  Id.; see also Klein v. Jones, 980 F.2d 521, 531-32 (8th Cir. 1992) (Harrell rule applies to oil and gas leases under Arkansas law).  In Frey, the Supreme Court of Louisiana invoked the Harrell rule en route to a similar holding under Louisiana law.  See 603 So.2d at 171 ( lessor is entitled to royalties on take-or-pay payments made to lessee by natural gas pipeline purchaser); id. at 173-74 (recognizing Harrell rule).  Frey similarly involved an oil and gas lease, and similarly was governed by state non-Uniform Commercial Code (U.C.C.) law.  The Harrell rule provides that, because of the unique nature of the lessor/lessee relationship, lessors and lessees are joint venturers, and "oil and gas leases should be construed in a manner so that the lessee and lessor split all economic benefits arising from the land."  Klein v. Arkoma, 73 F.3d at 783; see also Alameda Corp. v. Transamerican Natural Gas Corp., 950 S.W.2d 93, 99 (Tex. App. 1997) ("the Harrell rule considers the gas lease a co-operative venture where the lessor contributes the land and the lessee contributes the capital and expertise necessary to develop the minerals for the mutual benefit of both parties.") (alterations and internal quotation marks omitted); Thomas A. Harrell, Developments in Nonregulatory Oil and Gas Law, 30 Inst. on Oil & Gas L. & Tax'n 311, 334 (1979) (source of Harrell rule).

JN cites <u>Klein v. Arkoma</u> and <u>Frey</u> in support of its argument that Western was unjustly enriched. For the reasons discussed below, we do not believe that the Supreme Court of North Dakota would find those cases persuasive.

First, the Harrell rule appears to have won acceptance in only a small minority of jurisdictions. The Texas Court of Appeals recently declined to adopt the Harrell rule even in the context of oil and gas leases, stating:

> The "co-operative venture" theory . . . is derived from unique state statutes that expand the definition of "royalty" in mineral leases. Most states have no such legislation and therefore, these cases may stand alone. In fact, the co-operative venture theory has not received very much additional support, and several recent cases have eschewed that approach in favor of a literal reading of the lease terms. Accordingly, we decline Alameda's invitation to depart from precedent and follow the minority "co-operative venture" rule.

<u>Alameda</u>, 950 S.W.2d at 99 (citations, alterations, and internal quotation marks omitted). Of the several cases discussing the limited applicability of the Harrell rule, the Tenth Circuit's decision in <u>Harvey E. Yates Co. v. Powell</u>, 98 F.3d 1222, 1233-34 (10th Cir. 1996), is particularly instructive. There the court noted that the <u>Frey</u> and <u>Klein</u> decisions were based on peculiarities of Louisiana and Arkansas lease law. <u>Id.</u> at 1233. Finding that New Mexico lease law differed in relevant respects from that of Arkansas and Louisiana, the court found the Harrell rule inapplicable under New Mexico law. In so doing, it noted that its decision was in accordance with the modern trend of construing leases literally. <u>Id.</u> at 1233-34. Thus, even if we were faced with a lease, the Harrell rule would not necessarily apply.

However, we are not presented with a lease, but rather with a purchase and sale agreement negotiated between large corporate entities, each with squads of lawyers and

industry and marketing experts, in a commercial setting. JN is not a lessor, and Western is not a lessee. The production of gas from JN's wells was always ancillary and subservient to JN's primary purpose—the production of oil. JN cites, and we find, no case in which the Harrell rule has been applied in this very different context. In North Dakota, oil and gas purchase and sale agreements are governed by Article II of the U.C.C. See Koch Hydrocarbon Co. v. MDU Resources Group, Inc., 988 F.2d 1529, 1534 (8th Cir. 1993) (North Dakota U.C.C. applies to contract for sale of natural gas) (citing N.D. Cent. Code § 41-02-05(2)). Pre-extraction oil and gas leases, on the other hand, fall beyond the scope of the U.C.C. See N.D. Cent. Code § 41-02.1-03(1)(h) (the term "goods," for purposes of U.C.C. lease chapter, excludes "minerals or the like, including oil and gas, before extraction"); accord Ark. Code Ann. § 4-2A-103(1)(h). Therefore, while the contract between JN and Western is governed by the U.C.C. as adopted in North Dakota, the leases at issue in Klein v. Arkoma were governed by the non-U.C.C. statutory and common law of Arkansas. To our knowledge, the Harrell rule has never been invoked in the context of a U.C.C. governed contract, and we believe that the Supreme Court of North Dakota would find the Harrell rule unpersuasive in this U.C.C. governed case.

This result makes good sense as well as good law. While lessors are often commercially unsophisticated, ordinary landowners who have deposits of oil and gas under their farms and ranches and who lack the knowledge, expertise, and capital necessary to extract and market these mineral resources, oil and gas producers like JN are large, sophisticated, corporate merchants who can be trusted to guard their own interests. Therefore, in the absence of procedural unconscionability, the role of courts under the U.C.C. is simply to assure each merchant the benefit of its bargain. See LaSociete Generale Immobiliere v. Minneapolis Community Dev. Agency, 44 F.3d 629, 637 (8th Cir. 1994) ("[W]here, as here, two sophisticated parties negotiated a commercial contract which was executed in the absence of fraud, duress, or any other form of unconscionability, we will not rewrite the contract in order to save a contracting party from its own poor decisions."), cert. denied, 516 U.S. 810 (1995);

Morello v. Federal Barge Lines, Inc., 746 F.2d 1347, 1351 (8th Cir.1984) ("[C]ourts of law do not sit in order to save parties from their contractual mistakes."); Gelderman & Co. v. Lane Processing, Inc., 527 F.2d 571, 576 (8th Cir. 1975) ("It is not the province of the courts to scrutinize all contracts with a paternalistic attitude and summarily conclude that they are partially or totally unenforceable merely because an aggrieved party believes that the contract has subsequently proved to be unfair or less beneficial than anticipated.").

Additionally, JN's theory is precluded by our decision in Koch Hydrocarbon, 988 F.2d at 1547. There we applied North Dakota law to a producer/processor relationship nearly identical to the one in the case at bar. There, as here, the processor paid for the gas it resold to MDU with a percentage of the proceeds obtained from such resale. There, as here, MDU was unable to meet its take-or-pay obligations. The only difference between Koch Hydrocarbon and the case at bar is that instead of settling, as Western did, Koch sued MDU and won. However, the district court reduced Koch's damage award so that it reflected only the percentage of MDU's contract obligations which would have been retained by Koch. In other words, it denied recovery of the portion of gas proceeds which Koch would have passed through to its producers. On appeal, we declined to invoke the doctrine of unjust enrichment. Rather, we upheld this reduction in damages, writing, "[i]f the gas was not sold, [the processor] did not owe the producers their cut[.]" 988 F.2d at 1547. Faced with nearly identical facts and an analogous contract in the case at hand, we can hardly reverse course and determine that, under the same North Dakota law, the processor does owe the producers a "cut," even though no gas was sold. (See Dist. Ct. Mem. & Order, Apr. 15, 1996, at 3; Appellant's App. at 19 ("The $15,000,000 payment is not for gas sold.")).

Most importantly, as discussed above, the jurisprudence of the Supreme Court of North Dakota clearly forecloses relief on claims for unjust enrichment in the face of an express contract. While the Supreme Court of North Dakota may see fit to carve out exceptions to its rule, we decline to do so here, because "the views of the state's

highest court with respect to state law are binding on the federal courts." Wainright v. Goode, 464 U.S. 78, 84 (1983).

## III.

"We may affirm on any ground supported by the record." Doe v. Norwest Bank Minnesota, N.A., 107 F.3d 1297, 1301 (8th Cir. 1997). We therefore consider JN's other theories of relief to determine if they support the district court's ruling. At the district court, JN advanced four theories of relief. In addition to its unjust enrichment theory, JN alleged three other theories. First, JN alleges that Western breached the express terms of the contract. Second, JN alleges that Western breached the duty of fair dealing implied in the contract. Last, JN claims to be a third party beneficiary of Western's contract with MDU, and alleges that Western breached that contract when it appropriated the proceeds due JN.

All of JN's remaining claims ring in contract. Both JN's contract with Western and Western's contract with MDU are primarily for the sale of natural gas and are thus governed by the North Dakota U.C.C. See Koch Hydrocarbon, 988 F.2d at 1534 (North Dakota U.C.C. applies to contract for sale of natural gas) (citing N.D. Cent. Code § 41-02-05(2)). Western argues that JN's contract claims are time-barred pursuant to North Dakota Century Code § 41-02-104, which provides in relevant part:

> An action for breach of any contract for sale must be commenced within four years after the claim for relief accrued.
> . . . .
> A claim for relief accrues when the breach occurs, *regardless of the aggrieved party's lack of knowledge of the breach.*
> . . . .
> This section does not alter the law on tolling of the statute of limitations . . . .

Id. (emphasis added).

-13-

All of JN's contract claims contest Western's May 11, 1987, settlement with MDU. JN filed its complaint on May 6, 1993—nearly six years after the settlement, and more than four years after the last annual payment of $4,000,000 was made on April 26, 1989. The district court applied the discovery rule and found that the statute of limitations had not run, writing, "[t]he action is not time barred, the plaintiff's becoming aware of the $15,000,000.00 payment only when the State of North Dakota demanded a tax payment arising from the payment." Dist. Ct. Mem. and Order, Apr. 15, 1996, at 5. When it applies, the discovery rule provides that a cause of action "accrues when the plaintiff discovers[] or should have discovered the cause of injury." Osborn v. United States, 918 F.2d 724, 731 (8th Cir. 1990). When a claim accrues is a question of law. See id.

To the extent that the district court was speaking of JN's contract claims, its reliance on the discovery rule is clearly misplaced. While the Supreme Court of North Dakota has found the discovery rule applicable to some statutes of limitations, see Hebron Pub. Sch. Dist. No. 13 v. United States Gypsum Co., 475 N.W.2d 120, 124 (N.D. 1991), it has not adopted this rule in the context of the U.C.C. Moreover, the North Dakota Century Code expressly prohibits the application of the discovery rule in this context. It provides that actions for breach of contract under Article II of the U.C.C. accrue "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." N.D. Cent. Code § 41-02-104(2) (U.C.C. § 2-725). The clear import of this sentence is to prevent the application of the discovery rule, and to apply the discovery rule here would be to write section 41-02-104(2) out of the code. Accordingly, JN's knowledge or lack of knowledge of the alleged breach is irrelevant, and JN's contract claims are barred by the application of section 41-02-104 absent some grounds for equitable relief from the effect of the statute of limitations.

JN argues that the statute of limitations should be tolled because Western fraudulently concealed its settlement with MDU. The North Dakota legislature has

-14-

codified the doctrine of fraudulent concealment at section 28-01-24, which provides:

> When, by fraud or fraudulent concealment, a party against whom a claim for relief exists prevents the person in whose favor such claim for relief exists from obtaining knowledge thereof, the latter may commence an action within one year from the time the claim for relief is discovered by him or might have been discovered by him in the exercise of diligence.

N.D. Cent. Code § 28-01-24 (1991). Article II of the North Dakota U.C.C. indicates that tolling doctrines such as fraudulent concealment are not preempted by the U.C.C. statute of limitations provisions. See id. § 41-02-104(4) ("This section does not alter the law on tolling of the statute of limitations . . . ."). In the absence of any authority supporting the contrary position, we therefore conclude that the Supreme Court of North Dakota would apply the doctrine of fraudulent concealment to actions falling under Article II of the U.C.C.

In order to defeat the statute of limitations, JN must establish fraudulent concealment "to the satisfaction of the court or jury, as the case may be, by a fair preponderance of the evidence." Id. § 28-01-24. The district court did not determine whether Western fraudulently concealed its alleged breach of contract. Nor did it determine when, in the exercise of proper diligence, JN might first have discovered Western's settlement with MDU. We therefore remand to the district court for consideration of these issues. See, e.g., Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986) ("If the Court of Appeals believed that the District Court had failed to make findings of fact essential to a proper resolution of the legal question, it should have remanded to the District Court to make those findings."). If, on remand, the district court finds that fraudulent concealment did occur and that JN satisfied the time requirements of section 28-01-24, the court should then proceed to consider the merits of JN's contract claims, which it did not do in the first instance. If the court finds that Western did not engage in fraud or that JN failed to satisfy the time requirements of

-15-

section 28-01-24, then JN's contract claims are barred and summary judgment for Western will be appropriate.[6]

## IV.

We hold that the district court erred in entering summary judgment for JN on an unjust enrichment theory, and we reverse. We further hold that Article II of the North Dakota U.C.C. prohibits courts from applying the discovery rule to breach of contract actions arising under it. We remand to the district court for a determination of whether Western engaged in fraudulent concealment and, if fraudulent concealment is found, a decision on the merits of JN's contract claims. Because we reverse the district court's judgment, we do not reach JN's cross appeal. We deny JN's motion to strike.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]We note that JN included in the second claim made in its complaint that Western breached its "duty of fair dealing" and also breached "its fiduciary responsibility" to JN. Neither party argued "breach of fiduciary duty" before us, nor did the district court include any discussion of such a claim in its order on the summary judgment motion. Accordingly, we do not address such a claim here.